UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JUICY COUTURE, INC. and L.C. LICENSING, :
INC.,                                   :
                                        :
                    Plaintiffs,         :    04 CIV. 7203 (DLC)
                                        :
          -v-                           :    OPINION AND ORDER
                                        :
L'OREAL USA, INC. and LUXURY PRODUCTS,  :
LLC,                                    :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For Plaintiffs Juicy Couture, Inc. and
L.C. Licensing, Inc.:
William Spatz
Keith Walter
Erica Klein
Nicholas Koch
John Daniel
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

For Defendants L'Oreal USA, Inc. and
Luxury Products, LLC:
Robert Sherman
Danielle White
Eric Bensen
Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street
New York, NY 10022


DENISE COTE, District Judge:

     Juicy Couture, Inc. and L.C. Licensing, Inc. ("Couture")

purveyors of women's clothing and related items, have sued

L'Oreal USA, Inc. and Luxury Products, LLC ("Lancôme"), a maker

and seller of cosmetics and fragrances, for trademark

infringement.  Couture asserts rights in its registered marks

JUICY, JUICY COUTURE and CHOOSE JUICY.  It asserts common law

rights in the marks Juicy Pop Princess, Be Juicy, Wear Juicy, The Joy of Juicy and Juicy Girls Rule. It claims that Lancôme infringed its rights by adopting the mark Juicy Wear as a product name, and by using the words juicy, Juicy Pop and Juicy Gossip in advertising and promotions in mid-2003 and mid-2004 in connection with two in-store promotions of Lancôme products.

Couture seeks damages based on the sales of Juicy Wear. It also seeks an injunction preventing Lancôme from using Juicy Wear as the name or trademark for any product; using juicy alone or in combination with another word or phrase that means apparel or has an apparel connotation; using juicy alone or in combination with any word or phrase that means bags or connotes bags; promoting, advertising or marketing its line of Juicy products with signs, displays, or advertising which conspicuously or dominantly present the word juicy alone or in combination with another word which in the aggregate is not the trademark or name of a Lancôme Juicy product.

This Opinion presents the findings of fact and conclusions of law following a bench trial held between April 4 and April 12, 2006. For the reasons described below, judgment is entered for Lancôme.

Procedural History

Couture's complaint, filed on September 9, 2004, alleged seven claims: trademark infringement, false designation of origin and unfair competition, and trademark dilution under the Lanham

2

Act; deceptive acts and practices and trademark dilution under
New York General Business Law; and trademark infringement and
unfair competition under New York common law.  The complaint
based these claims on Lancôme's sale of six products: JUICY
TUBES, JUICY ROUGE, Juicy Tubes Pop, Juicy Crayon, Juicy Vernis,
and Juicy Wear, and Lancôme's use of Juicy and Juicy Pop to
describe "a line of cosmetics and fragrances."

On November 16, 2005, following the close of discovery,
Lancôme moved for partial summary judgment precluding a monetary
recovery, arguing that Couture could not show that Lancôme had
acted in bad faith, an essential component of any claim for
damages.  On December 1, Lancôme filed a separate motion for
summary judgment based on its affirmative defense of laches,
relying on Couture's failure to oppose Lancôme's registration of
the marks JUICY TUBES and JUICY ROUGE and failure generally to
oppose Lancôme's development of its line of Juicy products.  On
January 27, 2006, Lancôme moved for summary judgment on the
claims of trademark dilution and deceptive acts and practices
under New York state law.  On February 10, the parties stipulated
to a voluntary dismissal of those claims, mooting Lancôme's
January 27 motion.

Oral argument on Lancôme's remaining summary judgment
motions was held on February 15.  At oral argument, Couture
substantially narrowed its remaining claims.  With the exception
of Juicy Wear, it withdrew all claims that Lancôme's individual

products infringed Couture's trademarks.[1]  While Couture maintained the position that the marketing of Lancôme's products was infringing, it narrowed those claims to focus on the Juicy Gossip and Juicy Pop promotional events in 2003 and 2004.  While neither promotion was precisely identified in the complaint, some elements of the promotions were described, particularly the distribution of certain gifts with purchase during those events.

Couture's demand for a jury trial was struck in an Opinion and Order dated March 7.  <u>Juicy Couture v. L'Oreal, USA, Inc.</u>, 04 Civ. 7203 (DLC), 2006 WL 559675, at *1 (S.D.N.Y. Mar. 7, 2006).  In a separate Order, also dated March 7, both of Lancôme's motions for summary judgment were denied, and the trial long scheduled to begin on April 17, was converted to a non-jury trial scheduled to begin on April 4.


<u>Trial Procedure</u>

The trial was conducted in accordance with the Court's Individual Practices and the March 7 Order.  The parties filed a Joint Pretrial Order and proposed findings of fact and conclusions of law on March 23.  The parties also served affidavits containing the direct testimony of all their witnesses, as well as copies of all the exhibits and deposition testimony which they intended to offer as evidence in chief at

---

[1] At oral argument, Couture's counsel proffered a new theory of trademark infringement based on selling a group of individually non-infringing products as a collection.  Couture abandoned this newly-minted theory in response to a Lancôme motion <u>in</u> <u>limine</u>.

trial.

With its Pretrial Order submissions, Couture presented affidavits constituting the direct testimony of Gela Taylor ("Taylor"), Co-President and Co-Founder of Juicy Couture, Inc.; Janey Lopaty ("Lopaty"), Vice President of Public Relations for Juicy Couture, Inc.; Anita Jacobson ("Jacobson"), Director of New Business Development and formerly Director of Marketing and Licensing for Juicy Couture, Inc.; Theresa Pastor ("Pastor"), a paralegal with the law firm Kramer, Levin, Naftalis & Frankel LLP; and Milan Chromecek ("Chromecek") and Verena Bomhard ("Bomhard"), partners with the international law firm Lovells. It also offered testimony from four experts: Philip Johnson ("Johnson"), Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a market research and consulting firm; James Malackowski ("Malackowski"), President and Chief Executive Officer of Ocean Tomo, LLC, a business consulting firm; Larry Hotz ("Hotz"), President and founder of Right Angle Research, LLC, a public relations consulting firm; and Marilyn Levey ("Levey"), the principal of Levey Marketing Services, Inc., a marketing and merchandising consulting company. With the exception of Pastor, Bomhard, Chromecek and Malackowski, whom Lancôme chose not to cross-examine, and Hotz and Levey, whose testimony was struck before trial, each of these witnesses appeared at trial and was cross-examined.

Lancôme offered the testimony of Odile Roujol ("Roujol"),

Deputy General Manager of Lancôme;[2] Louise Rosen ("Rosen"), a former Lancôme employee who served as Group Product Manager for Makeup during the development of Juicy Tubes; Austin Mathis ("Mathis"), Vice President of Accounting for L'Oreal's Luxury Products Division; Suzanne Davidowitz ("Davidowitz"), Senior Vice President Corporate Communications for L'Oreal USA, Inc.; José Monteiro ("Monteiro"), Chief Trademark Counsel of Lancôme Paris; and Jaclyn Brody ("Brody"), a paralegal at Paul, Hastings, Janofsky & Walker LLP. Lancôme offered expert testimony from Jacob Jacoby, Professor of Consumer Behavior and Retail Management at New York University's Leonard N. Stern Graduate School of Business, where he holds the Merchant's Council endowed chair; Thomas Dupont, the President of $D^2$ Research, a survey research and consulting firm; and Daniel McGavock ("McGavock"), Vice President of CRA International, a financial consulting firm. Couture chose not to cross-examine Monteiro, Brody and McGavock, and they did not appear at trial.

The parties also offered excerpts from the deposition testimony of the following individuals. Couture offered excerpts from the depositions of Angela Ahrendts, Senior Vice President of Liz Claiborne; Marie Cesbron, formerly the Assistant Vice President of Makeup Marketing for Lancôme USA; Dalia Chammas, Senior Vice President and General Manager of Lancôme USA; Edgar Huber, President of L'Oreal's Luxury Products Division; Elizabeth

---

[2] Roujol was also examined by Couture as a witness in its case in chief.

Park, formerly the Vice President of Makeup Marketing of Lancôme USA; and Nina White, Deputy General Manager and Senior Vice President for Lancôme USA. Lancôme offered excerpts from the depositions of Elizabeth Harrison, owner and founder of the public relations firm Harrison & Shriftman; Jennifer Hatton, Director of Finance for L.C. Licensing, Inc.; Corey Wang, a former Marketing Coordinator at Juicy Couture, Inc.; and Art Spiro, President of Liz Claiborne Cosmetics.

Prior to trial, Lancôme moved in limine to strike the testimony of Couture's experts Johnson, Malackowski, Hotz, and Levey; to preclude evidence concerning foreign trademark proceedings; to preclude the introduction of settlement communications into evidence; and to preclude evidence, testimony and argument concerning a "Juicy Collection". Lancôme's motions against Hotz and Levey were granted. Its motion against Malackowski was granted in part. Couture withdrew its arguments concerning a "Juicy Collection", and the remaining motions were denied.

Couture moved in limine to preclude Davidowitz and Mathis for failure to disclose them during fact discovery; and to preclude Lancôme from asserting an advice of counsel defense. The latter motion was granted. Couture was given the opportunity to depose Davidowitz before trial, and the former motion was otherwise denied.

<u>Findings of Fact</u>

The following constitutes the findings of fact.[3]  In brief, the evidence shows that Lancôme chose the name Juicy Tubes for a lip product in 1999 without any knowledge of Couture, which was named Travis Jeans at that time, or of Couture's products. Lancôme registered the marks JUICY TUBES and later JUICY ROUGE, a name for another lip product that it introduced into the marketplace in 2003, in both France and the United States without any opposition from Couture.  By 2002, Couture's business was moving beyond jeans and t-shirts and becoming more successful and well-known.  In 2003, while in the process of being purchased by Liz Claiborne, Couture opposed for the first time, and only in Europe, a Lancôme trademark application for the word Juicy. Couture's founders hoped that becoming part of Liz Claiborne would allow it to expand its business beyond clothing and accessories.  When settlement discussions in Europe in 2004 failed, Couture filed this lawsuit and began for the first time to oppose Lancôme's trademark applications in this country.

As it is presently configured, this case principally concerns events occurring in the United States in 2004, when Lancôme introduced its 6th product with a name that included the word Juicy -- this time a lip product called Juicy Wear.  Couture objects to that product name and objects to two promotions run by Lancôme, one in 2003 and one in 2004, for other Lancôme Juicy

---

[3] Additional fact finding appears during the presentation of the Conclusions of Law.

products.  Because Lancôme adopted the word Juicy in good faith and without knowledge of Couture or its goods, the story will begin with Lancôme's decision to use that mark on its cosmetics, and its development of its line of Juicy cosmetics.

Lancôme

A.   Lancôme's Business

Lancôme was founded by a Frenchman and launched in 1935 at the Universal Exhibition in Brussels with the introduction of five fragrances.  Its founder chose the rose as the symbol for his company, and it has remained its symbol.  Over time, Lancôme added makeup and skin care products.  Lancôme products were introduced to the United States in the 1950's.  It now sells cosmetics in 163 countries.  Lancôme is a recognized and successful cosmetics name in the Untied States.  Its products are sold in better department stores such as Bloomingdale's and Nieman Marcus, and specialty stores.

Lancôme products are customarily sold in the United States within the cosmetics area of the store, either at Lancôme counters or at sections where only Lancôme products are sold. Lancôme counters are staffed by Lancôme personnel who usually wear smocks that display the Lancôme name.  The counters and sections also prominently display the Lancôme name and its rose design.

Lancôme uses its name and the rose design on all of its trade dress, including the packaging for its individual products.

This is true of the products at issue here.  The trade dress includes silver packaging and black lettering.

B.  Lancôme's Development of JUICY TUBES

In January 1999, Rosen, working in Lancôme's Paris, France headquarters, developed the concept for a high shine lip gloss in a tube.  She and her team gave the project the code name: "Juicy Tubes."  She and Lancôme makeup artist Fred Farrugia proposed including Juicy Tubes, a shiny and tasty lip gloss, in the Spring 2000 Pollen color collection.[4]  The word juicy reminded Rosen of juicy fruit sweets from England, where she grew up, and she thought that the name juicy for products intended to come in the yellows and oranges of the Pollen color collection was an apt description.  The tube was a small, flexible package.  The company has used the word juicy for its Juicy product line to connote gloss and shine.

C.  JUICY TUBES' Trademark Registration

Lancôme ordered a trademark search report in the United States for Juicy Tubes lip gloss on August 17, 1999.  Searching cosmetics, soaps, pharmaceuticals, and other similar categories, it captured such widely disparate marks as LONDON TUBES and JUICE BAR.  No records were found that contained both "juic" and "tube" and no records were uncovered that had any reference to Couture

_____

[4] Lancôme regularly markets a seasonal color collection consisting of a variety of Lancôme products from its different lines that come in the same or a complimentary shade.

10

(or Travis Jeans).

The search did uncover a registration for cosmetics with the word juicy, specifically JUICY LIPS for lipstick (registered in 1996 to Pentech International). It also uncovered registrations for products with the word juice or a word derived from juice, such as JUICED UP for a body cleanser (registered in 1999 to Aramis Inc.), JUICE BAR for perfume (registered in 1998 to Parfums de Coeur, Ltd.), and THE JUICE for hair products (registered in 1985 to Larry Edward Clark). Image Laboratories had registered a series of marks with the word juice alone or in combination with another word for hair products. Applications were pending to register Jaguar Juice Lotion for tanning lotions, and Mossimo Juice for cologne. A search of domain names also failed to uncover Couture. Juicy.com, Juicy.net, and Juicy.org were all registered to other entities.

On September 9, Lancôme applied in France for trademark rights to use JUICY TUBES for cosmetic products, namely, lip gloss. On January 25, 2000, it made an identical application with the United States Patent and Trademark Office ("PTO"). The PTO published the mark for opposition on January 16, 2001. Couture did not oppose the registration. The mark was registered on April 10, 2001.


D.    Lancôme's Marketing of JUICY TUBES

In January 2000, JUICY TUBES was included in Lancôme's Pollen color collection. In Spring 2001, JUICY TUBES was

included in a second color collection, the Pinksplash color collection.  After the success of these efforts, it became a permanent part of Lancôme's product line in January 2002. Beginning in June 2002, and running through 2003, Lancôme advertized JUICY TUBES in leading newspapers and women's magazines, such as <u>Vogue</u> and <u>Harper's Bazaar</u>.

E.    JUICY ROUGE Trademark Registration

Lancôme next developed the product Juicy Rouge, a shiny lipstick.  Lancôme ordered a full trademark search in the United States for Juicy Rouge on June 27, 2002.  Unlike the search done in 1999 in connection with JUICY TUBES, this search identified an application by Travis Jeans, specifically, two identical pending trademark applications filed on February 28, 2002, for the marks Juicy Couture and Juicy Jeans in eleven classes of goods including cosmetics.

As was true for the search done for JUICY TUBES, this search also revealed several registrations for marks that included the word Juicy or Juice[5] and even more applications for such marks.[6] In addition, and of interest to this litigation because of Lancôme's adoption of the mark Juicy Wear in 2004, the search also reflects L'Oreal's own application to register a mark with

---

[5] JUICY LIPS, JUICY LUBE, CREATIVE JUICE, and LEMON JUICE & GLYCERINE.

[6] Fruity Lip Juice (Avon), Genie Juice (JKA, Inc.), Juice Beauty (Juice Beauty, Inc.), Totally Juicy (PH Beauty Labs, Luckjuice (Debbie Klonk), and Juice (Juice Beauty, Inc.).

the word Wear, specifically Rouge Wear in connection with liquid
lipcolor.  The search results also reflect that Lancôme or its
affiliate L'Oreal had applied for trademarks for Juicy Crush
(filed and published for opposition in 2000); Juicy Fizz (filed
and published for opposition in 2000); Juicy Fresh (filed and
published for opposition in 2000); Juice Punch (filed in 2000,
published for opposition in 2001); Juice Stick (filed in 2000,
published for opposition in 2001); and Colour Juice (filed in
2000, published for opposition in 2001).  This report
demonstrates the existence of a significant interest in the marks
Juicy and Juice for cosmetics long before the events at issue
here.

Lancôme applied for PTO registration for JUICY ROUGE on
December 19, 2002.  It reflected a French registration date of
June 21, 2002.  The mark was published for opposition on November
25, 2003.  Again, Couture did not oppose the registration.  JUICY
ROUGE was registered as a trademark for lipstick on April 19,
2005.

F.   Juicy [Gossip]

Lancôme introduced JUICY ROUGE into the United States market
in May 2003 through a promotion it called "Juicy [Gossip]."
Lancôme runs approximately 54 promotions each year at its
retailers in the United States.  They include Gift-with-Purchase,
Purchase-with-Purchase, and other in-store events.  The cosmetics
that are given away in the Gift-with-Purchase and Purchase-with-

Purchase promotions are always Lancôme products.  Lancôme makes approximately 40% of its sales of its luxury cosmetics during the Gift with Purchase and Purchase with Purchase promotional events.

During Juicy Gossip a makeup artist taught consumers how to apply JUICY TUBES and JUICY ROUGE.  The promotional materials for the "Juicy [Gossip]" event that were developed by Lancôme and sent by retailers to consumers through a cooperative advertising program ("co-op advertising") featured many Lancôme products, such as Star Bronzer, and Résolution.  The theme of the materials was the opportunity to learn the makeup secrets of the Hollywood stars.  For example, and placed in brackets to make it seem as if it were being whispered, it read, "[Try the stars' gorgeous lash trick.  A magical date look.]"  For JUICY ROUGE, the brochure stated, "[Which pop princess and sexy city divas think Juicy Tubes in Fling, Miracle and Summer are perfect for their pout?  And to juice up those looks, try new Juicy Rouge for super-lasting shine]"[7]

The Lancôme website described the event in this way.  "Come to the Lancôme counter for the latest juicy gossip.  How do those Hollywood Divas get their looks?  Book your appointment today with your Lancôme makeup Artist and try the latest Juicy Look."  The gift-of-fun, which came with any $25 purchase, was Lancôme products[8] in a striped "new Lancôme signature tote."  None of the

---

[7] The entirety of the copy is capitalized in the brochure.

[8] Lancôme gift packages always include a lipstick and mascara.  This gift was no exception.

14

gift items was a Lancôme cosmetics item from its Juicy line. The website described the gift in these terms: "[From the fundamental to the fun-onemal, it's a case for taking off anytime: the new Lancôme signature tote with matching change purse, filled with beauty must haves. Make it yours.]"

Beginning in May 2003, and continuing into 2004, Lancôme advertized JUICY ROUGE in national newspapers and leading women's magazines. An internal Lancôme analysis of sales through October 2003, indicated that JUICY ROUGE was most popular with the thirty-five to forty-five year old age group. Customers were reported to like it because "they can get a gloss-like shine."

G.   Juicy Vernis, Juicy Crayon and Juicy Tubes Pop

In 2003, Lancôme developed three new products as line extensions of JUICY TUBES. Juicy Tubes Pop is a lip gloss with a tingling sensation; it was a permanent addition to the collection. Juicy Crayon, a shiny lip gloss pencil, and Juicy Vernis, a shiny nail polish, were "one-shot" offerings and did not become permanent additions to Lancôme's cosmetics line. Lancôme advertised Juicy Tubes Pop, but not the other two products.

Lancôme ordered full United States trademark searches for these three marks in early October 2003. The searches again identified the marks Juicy Couture and Juicy Jeans. The search also identified a new mark for Couture: Juicy Girl. According to the report, Travis Jeans filed on February 28, 2002 to register

Juicy Couture and Juicy Jeans in eleven classes of goods, including cosmetics and perfume; they were published for opposition on August 12 and September 2, 2003, respectively. It reflected a March 17, 2003 filing for the mark Juicy Girl in connection with two classes of goods, including cosmetics and perfume. As with the other reports, the words Juice or Juicy appeared in several registered marks for cosmetics, and in many more applications for registration.

Lancôme applied for trademarks for Juicy Crayon and Juicy Vernis on November 17, 2003, and for Juicy Tubes Pop on June 16, 2004. Lancôme had applied in France for registration of Juicy Tubes Pop on January 29, 2004.

H.   The Juicy Pop Promotion

Lancôme introduced Juicy Tubes Pop into the United States market beginning in May 2004 through a promotional campaign called Juicy Pop. A press release sent to beauty editors began, "a new juicy bunch bursts onto the 'pop' scene. Lancôme introduces the juiciest news yet.... new Juicy Tubes Pop...."

During the in-store Juicy Pop event makeup artists determined the consumer's "color scope" for Juicy Tubes Pop, Juicy Vernis and Juicy Crayon. A store participated for one to two weeks during a period that ran from May 21 to July 22. During that time, customers were offered a "Gift of Fun," which included a striped beach bag, flip-flops, and Lancôme products. Lancôme also sold a fragrance called Lôlli Pop in conjunction

with this promotion.

At least some stores ran radio ads in connection with the Juicy Pop event.  A typical radio advertisement began, "For Lancôme, this is Juicy Pop Spring 2004 gift-to-fund radio."  It continued, "are your lips ready for a tingly burst of icy shine? Introducing Juicy Tubes Pop from Lancôme, a new collection of ultra shiny cooling lip gloss that will keep you looking hot and feeling cool all summer."  During the ad, besides repeating the event name Juicy Pop several times, the word juicy was used as an adjective, as in, "Try a new look for summer with a juicy make-over", and come in and receive "our gift of the juicy summer tote filled with everything from makeup to bronzer, even a matching pair of flip flops."

Lancôme developed in-store signs and displays prominently featuring the words Juicy Pop in pink and orange to accompany the event.[9]  Lancôme also developed a circular plastic display disc for the counter-top on which to set the Juicy Tubes Pop, Juicy Vernis and Juicy Crayon products.  It was called the play-station, and remained on the counter for a few months after a store's two-week Juicy Pop promotional event.  (The play-station is described in more detail later in the Opinion.)  During the period immediately following the Juicy Pop event, Lancôme also

---

[9] Couture complains that the Juicy Pop display made it seem like Couture was "having a party" at the Lancôme counter. Although admitting that it has no rights in any color or color combinations, it argues that the use of pink and orange was offensive because they are colors that Couture also uses.

introduced its newest Juicy product, Juicy Wear. At least at some stores, the Juicy Wear products were displayed near the play-station so that consumers could easily look at the entire family of Juicy cosmetics. Lancôme considered the Juicy Pop promotion, and the play-station, a success.

I.    Juicy Wear

Lancôme's United States marketing team developed the concept for what became Juicy Wear in early 2003, when it conceived of a 2-step lipstick that includes a lipstick base and a clear, shiny gloss overlay in a tube. Lancôme debated the best name for the product. The company wanted to express long lasting wear and a shiny effect, but at least one key executive was concerned that the name Juicy was becoming banal. She noted that Lancôme's affiliate L'Oreal was launching a product called Color Juice. The company identified factors in favor of the name Juicy Wear, such as its ability to capitalize upon the "strong appeal of the juicy franchise," including the opportunity to "keep the edge of the juicy franchise on shine" while adding the concept of "long wear." The identified risks in this name choice were the risk "of confusion within the most successful franchise." There was a fear that the sales of Juicy Wear would cannibalize the sales of JUICY ROUGE and would conflict with the strategy of selling Juicy products at a lower price range.[10] One United States executive

_____

[10] JUICY TUBES and JUICY ROUGE sold at $15.50 and $20, respectively, while the company intended to sell Juicy Wear at $24.

observed that in this country Juicy "represents" shine and not sheer. She wanted to choose a name that would convey "[a] full burst of rich wear proof Juicy Color sealed with Juicy shine that lets you kiss, smile and seduce indefinitely."

Besides the name Juicy Wear, Lancôme considered Rouge Fusion, Vinyl Fixx, Vinyl Wear, Tatoo'n Shine, and Glossy Tatoo. In addition to the reference to L'Oreal during this discussion, there was a reference to Estée Lauder. In none of this internal debate is there any reference to Juicy Couture or its products. Simply put, Lancôme did not consider its competition to include any clothing manufacturer, and its product development and marketing teams focused exclusively on the trends within the cosmetics market and the competition it faced within that market.

Ultimately, Lancôme developed, and tested in October 2003, two 2-step products, one of which was called Juicy Wear, and the other of which was called Rouge Fusion. The Juicy Wear product outperformed its rival in staying power and name. An internal memo reports, "Juicy Wear as a name communicates a very unique and strong concept, with a formula that delivers on <u>long wear</u> and <u>high shine</u>. It significantly outperformed Rouge Fusion, both on concept (uniqueness, overall liking, key attributes) and use (on wear and shine)."

The United States Lancôme team recommended the adoption of Juicy Wear as part of the "Juicy franchise". It considered it "the perfect opportunity to recruit women (core target 25-35 yo) who expect <u>long wear</u> and <u>shine</u>. It would fit within our

19

geography, briniging [sic] an additional benefit to an additional
core target vs. Juicy Tubes and Juicy Rouge, while capitalizing
on the strong awareness of Juicy, preventing competitors from
copying us and keeping the edge."

Lancôme applied to the PTO for a trademark for Juicy Wear on
January 21, 2004.  Lancôme did not conduct a trademark search
before doing so.

The product was launched in July 2004, but was not fully
distributed until some weeks later.  An April 2004 press release
sent to beauty editors to inform them of this new product reads:
"Lancôme unveils the first long-lasting lip colour that's sealed
in super-juicy shine.  Introducing new Juicy Wear, ultra-lasting
full colour and shine lip duo."  In its text, the press release
uses such phrases as "Juicy dreams do come true," and "Juicy
proof...say good-bye to dry!"  Referring to its other Juicy
products, the release trumpets that "Lancôme, who first started
the 'Juicy' phenomenon with Juicy Tubes and Juicy Rouge, adds a
high-tech duo to its 'Juicy Dream Team.'"

The largest visual used at the Lancôme counter for Juicy
Wear was a close-up of a woman's open mouth and a dark red apple.
The lips have a luscious, high sheen appearance from the
lipstick, and the implied message is that the lipstick, which has
a color as dark and rich as the apple's, will even survive the
act of eating an apple.

Lancôme's sales data through August 2005 indicated that
Juicy Wear was most popular in the age group thirty-five to

forty-four, while JUICY TUBES and Juicy Tubes Pop were most popular among those twenty-five to thirty-four. This analysis must have been disappointing to Lancôme since one of the principal aims of the development of the Juicy product line was to attract younger women between the ages twenty-five and thirty-five, and even those as young as fifteen, to Lancôme products.

The term "wear" is commonly used in connection with lip products. Estée Lauder has a Double-Wear duo lip product; Clinique Laboratories, Inc. has Glosswear For Lips; Avon has Glazewear Liquid Lip Color and Perfect Wear All-Day Comfort Lipstick; Covergirl has Smoothwear Liptints; and L'Oreal has Wear Infinite.

J.   Lancôme's Other Trademark Applications for Juicy Products

In addition to the marks just discussed, between May and September 2003, Lancôme applied to register the marks Juicy & Fresh, Juicy Touch, Juicy, Juicy Stay, Juicy Last, and Juicy Style. In December 2003, it filed to register Juicy Kisses. Between April and August 2004, it filed to register Juicyful, Juicy Juice, Juicy Crush, Juicy Dessert, Juicy Drops, and Juicy Macaron. All of these applications were for cosmetics, except Juicy Crush, which was for a hair product.

K.   Marketing

Lancôme strictly controls its marketing and advertising of its products. This central control of its image extends even to

the countertop displays at Lancôme counters.  In recent years it has even provided its retail locations with a calendar to show which products and lines should be featured each month.

While Lancôme refers internally to its Juicy franchise, it rarely uses that term, or synonyms such as the Juicy collection or family, in advertising.  Its advertising typically refers to each product by its own name.

As with JUICY TUBES, JUICY ROUGE, and Juicy Tubes Pop, Lancôme supported Juicy Wear with print advertising, principally in women's magazines, and promotions.  All of the advertising prominently featured the Lancôme name and its rose.  Between 2002 and 2004, Lancôme spent almost 30% of its advertising budget in the United States on its Juicy products.

L.    Lancôme's Sales

Lancôme's sales of Juicy products peaked in 2003 and 2004. JUICY TUBES and JUICY ROUGE achieved their largest sales in 2003; Juicy Wear had its largest sales in 2004, the year it was launched.  The sales for all three products fell off considerably in 2005.  Lancôme experienced losses on Juicy Wear in both 2004 and 2005 at the marketing contribution and operating profit levels.  The sales of Juicy Wear have made a significantly lower contribution to profitability than the sales of Lancôme's other Juicy products.

M.   Lancôme's Knowledge of Juicy Couture

Rosen, who invented the name "Juicy Tubes" for Lancôme in France in 1999, did not know of Juicy Couture until 2002.  Roujol learned of Juicy Couture in January 2004 during a trip to Miami, when she noticed someone wearing a Juicy Couture jogging suit. Lancôme executive Marie Cesbron, who was involved with the selection of the Juicy Wear name, however, was familiar with Juicy Couture clothing before the launch of Juicy Wear.

Juicy Couture

N.   Juicy Couture's Business

Taylor and Pamela Skaist-Levy founded Travis Jeans, Inc. in 1989 with $200.  Initially, it designed, manufactured and sold maternity clothing under the name Travis Jeans.  In 1994, it moved into general apparel by adding t-shirts.  Couture describes itself as the company that "transform[ed] the t-shirt into an alluring fashion item."  Although it began with a V-neck t-shirt in a one-size-fits-all, the company was selling a t-shirt in three sizes by late 1997.

In 1996, during the period it was selling t-shirts, Travis Jeans began to use the mark JUICY on its clothing labels. Couture's two founders chose the name Juicy because they intended to convey that their clothes were, in their words, about California, glamour, and happiness.

In 1997, the company changed its hang-tags and labels to

JUICY COUTURE.  Over the years, as it added other lines of clothing, its clothing has been sold with other marks such as Juicy Girl and Juicy Baby.  Since June 2002, JUICY COUTURE garments are sold with at least two hang-tags, one that says JUICY COUTURE and another that says CHOOSE JUICY.

Also by 1997, Travis Jeans was selling Juicy-branded clothing in high-end department stores such as Bloomingdale's and Nordstroms.  Within two years, or by 1999, its wholesale sales amounted to approximately $11 million and its products were being sold in 800 stores.

Couture expanded into denim in 1999 with a JUICY JEANS line. As of 2000, 70% of its sales were of t-shirts and 30% were of jeans.  In 2001, it added track suits and sweaters.  According to Couture, "[u]sing the t-shirt as its core product, Juicy [] developed its collection to include a full range of coordinated tops and bottoms, including its signature tracksuits, in a variety of styles and fabrics, such as cotton, terry cloth, velour and linen."

In 2002, the company added a children's line and men's line. The company described its business in this way in 2002.  "Over the past five years, the Company has built a collection of t-shirts, tracksuits, jeans and other items that are coveted by fashion-forward customers for their close and sexy fits, premium fabrics, simple and direct detailing, and dramatic, tasteful colors."  At that time, Couture considered that its competitors were contemporary fashion designers such as Marc Jacobs and

Michael Stars, and denim companies such as Seven and Diesel.  In
that year, the company's sales essentially tripled, going from
$14 million in 2001 to $46 million.  This reflected sales in over
1000 locations.

In 2003, Couture added flip flops and outerwear.  By 2003,
its products were sold in over 1100 locations, and its wholesale
sales were over $92 million.  In 2004, after its acquisition by
Liz Claiborne, its wholesale sales were over $170 million.  That
year, it added socks and swimwear, and accessories like handbags,
totes, and jewelry.  In 2005, sometimes through co-branding
agreements, it added Barbie dolls, glasses, shoes, pet products
and T-Mobile Sidekicks.  The Juicy Couture Barbie comes in a box
bearing the crest that Couture uses on many of its products.  The
dolls in the box wear a t-shirt that says "Viva La Juicy" and a
scarf that says Juicy Couture.

The target customer for Couture is an "affluent, fashion-
conscious woman between the ages of 18 and 45."  A Spring 2005
effort to conceptualize the Couture brand, suggested that the
company should move from a brand that was "100% girlie" to a
brand that would be a celebration of self.  The workshop observed
that the "Juicy Couture brand, as we know it, right now, has lost
momentum," and required a repositioning.

As of today, Couture's products continue to be sold in high-
end department stores and specialty fashion boutiques.  Unwanted
inventory is sold in discount stores.

O.   Couture's Promotion

Juicy does not engage in traditional advertising.  It attempts to secure celebrity patrons and favorable mention in magazines and other media.  Beginning in 2000, Juicy began to maintain a collection of magazine articles in which Couture clothing is pictured or discussed.  Very few articles are from the period before 2002.[11]  Beginning in 2003, Couture began to get significant press coverage.  In October 2003, the two founders appeared on the television program "Oprah."

Taylor considers a seven page article in the April 2003 issue of <u>Vogue</u> to be among the most significant pieces of press coverage ever received by her company.  As Liz Claiborne was acquiring Couture, a <u>Vogue</u> reporter invited the two founders of Couture to Paris to observe their first Paris fashion shows.  The article begins with a full page picture of the founders and the text, "The haute tracksuit company from the Valley just may be the future of fashion.  So the California girls behind the label decided to check out fashion's present."  The article recounts visits with prestigious designers to whom they gave customized t-

_____

[11] Couture initially offered five large volumes of magazine material, none of it indexed, much of it undated, and some of it untranslated foreign language articles.  Frequently, the coverage features a celebrity wearing an article of clothing that is apparently sold by Couture, but only a person already familiar with the company's clothing would discern that fact since there is no discussion of Couture in the article and no logo visible. Couture later offered a much reduced selection of press coverage, including only articles that bore a date, magazine name, and some observable reference to Couture or its products.  It included in this revised offer, however, articles that picture a person wearing Couture clothing identified as such solely by the presence of what it calls a "J-pull" on the zipper.

shirts. Karl Lagerfeld's read "rebel couture." Interspersed with a recounting of their meetings with the French designers, there is a brief history of the two women and their company. Among the article's observations are, "A craze is upon us, one that validates the lifestyle of the yoga-practicing, self-employed, cheerful, rock-'n'-roll soccer mom," and, "What makes Juicy special is that, although the clothes are not fashion, they are the perfect complement to fashion. They are worn by, and made by, women who follow the trends, the couture, the whole deal, and who know the difference between a silhouette or fabric that works, and one that just gets you by."

Couture has a Vice President who is responsible for placing its products with celebrities to be worn in their personal lives or when they appear on television, in movies or in music videos. Couture has provided its products for use on television programs since 2001, including programs like "Sex and the City," "Friends," and "Buffy the Vampire Slayer." The programs usually request the products and pay wholesale prices for those items they use, returning the rest. Upon request, it has supplied its products to Britney Spears, Jennifer Aniston, Gwyneth Paltrow, Jennifer Lopez, Cameron Diaz, Julia Roberts, Sarah Jessica Parker, and Halle Berry, among other celebrities. In 2001, Couture provided Madonna with a track suit monogrammed with the name Madge, which is Madonna's nickname in England. She was frequently photographed in it while on tour in Europe. It has supplied its products for use in motion pictures, including "Kill

Bill Volume 2," "War of the Worlds," and "Mean Girls."

Couture has not conducted any consumer surveys to determine the extent to which consumers are aware of its brands. Couture continues to rely on the talents of its two founders for its creative direction.

P.   Couture's Registration of Trademarks

When Couture executives decide that they wish to use a word or a phrase as a trademark, they send a request to their attorneys to initiate the process to get trademark protection. The only marks for which Couture has sought protection are JUICY, JUICY COUTURE, Juicy Girl, Juicy Baby, JUICY COUTURE BABY, Juicy Jeans, Extra Juicy and CHOOSE JUICY.

Working through outside counsel, Couture made its first application to register a mark on December 13, 1994. It abandoned this initial application for the mark Juicy in connection with clothing. Its second application, filed on August 18, 1998, was also for the mark JUICY in connection with clothing, and resulted in a registration on October 12, 1999. It reflected a first use date of September 15, 1996.

As of August 17, 1999, when Lancôme did its trademark search for JUICY TUBES, Couture had filed four applications for trademarks for clothing, including the two just discussed. None of Couture's applications had resulted in a registration as of that time. The applications were for Juicy, Juicy Girl, and

Juicy Couture.[12]

As of June 27, 2002, when Lancôme did its trademark search for JUICY ROUGE, Couture had filed twelve trademark applications, ten of which were exclusively for clothing marks.[13] As of that date, it had obtained registration of the marks JUICY, JUICY COUTURE, and JUICY JEANS for clothing. Two of the applications were for multiple classes of goods, including cosmetics and perfumery. As indicated above during the discussion of Lancôme's search report, on February 28, 2002, Couture had applied to register the marks Juicy Couture and Juicy

---

[12] A notice of allowance of Juicy Girl in connection with clothing issued on March 7, 2000. A notice of allowance essentially allows an applicant six months, with opportunities for extensions, to file a Statement that the mark has been used in commerce. No registration issues without such a filing. On July 2, 1999, Travis Jeans applied to register JUICY COUTURE in connection with women's clothing, claiming a first use date of June 1997. It was registered on May 9, 2000.

[13] Couture filed for registration of JUICY JEANS on November 22, 1999 (for girls' and womens' clothing), claiming a first use date of March 1, 1997. It was registered on September 19, 2000. On January 3, 2002, Couture filed four applications for registration. It sought to register the mark JUICY for knapsacks and luggage, claiming a first use date of June 2005. It was registered on January 3, 2006. It filed to register JUICY COUTURE for luggage and bags, including tote bags, with a first use date of March 2000. It was registered on September 7, 2004. It sought registration for CHOOSE JUICY for clothing, reflecting a first use date of June 2002. It was registered on September 7, 2004. It sought registration for JUICY in connection with luggage and bags, reflecting a first use date of February 2004. It was registered on September 13, 2005. On February 28, 2002, it filed to register JUICY COUTURE for jewelry and clothing, reflecting first use dates of February 2004 and June 1997, respectively. The registration issued on July 26, 2005.

Jeans in multiple categories.[14]  As of today, neither mark has
been registered through that application.

Q.   Juicy Pop Princess and Wear Juicy

     Although Couture continued to apply for trademark
registrations after June of 2002, it has never applied to
register as a mark any of the logos for which Couture seeks
common law protection in this lawsuit.  Specifically, it never
applied to register the phrases Wear Juicy, Be Juicy, The Joy of
Juicy, Juicy Girls Rule, or Juicy Pop Princess.  This is
compelling evidence that Couture never considered its use of
these phrases to be a trademark use.

     Couture bases its claims in this lawsuit largely on the
assertion that it had common law trademark rights in two slogans,
Juicy Pop Princess and Wear Juicy.  Specifically, Couture
complains that Lancôme used the phrase Juicy Pop to describe a
promotion that ran during the period May through July 2004 and
introduced the lipstick product Juicy Tubes Pop.  Couture asserts

_____

     [14] A notice of allowance was issued on November 4, 2003, for
the mark Juicy Couture in connection with soaps, cosmetics,
perfumery, candles, eyeglasses, craft paper, leather goods,
kitchen utensils, textiles, clothing, and retail stores.  A
similar notice of allowance for Juicy Jeans was issued on
November 25, 2003.  Two notices of allowance were issued on
November 4 and 11, 2003 for Juicy Baby in connection with
clothing.  An application to register JUICY COUTURE BABY (for
clothing) was filed on January 3, 2004, reflecting a first use
date of March 2002.  It was registered on September 13, 2005.  A
notice of allowance issued on August 3, 2004, for Juicy Girl in
connection with cosmetics, handbags, and women's and girls'
clothing.  A notice of allowance was issued on September 21,
2004, for Extra Juicy in connection with clothing.

that this was wrongful because Couture had used a Juicy Pop Princess logo on t-shirts. Couture did not submit documentary evidence to show when, where, or how many of such shirts it sold, although it did offer a 2003 style sheet that shows it as one of several logos.

Couture also points to Lancôme's introduction in July 2004 of its Juicy Wear lipstick, asserting that it followed Couture's sale of shirts that bore the logo Wear Juicy. Again, Couture has provided no sales figures, and no documents to show when or where any such shirt sales took place.

R.   Liz Claiborne Buys Couture

In early 2002, Couture decided to seek a purchaser and engaged the investment banking firm Sage Co. By the summer of 2002, it had begun discussions with Liz Claiborne. During their meetings, Couture and Liz Claiborne discussed Lancôme's marketing of JUICY TUBES and its impact of the value of Couture's trademarks. On the eve of acquisition, as described below, Couture took its first action to assert trademark rights against Lancôme.

In April 2003, Travis Jeans, Inc. was sold to Liz Claiborne, Inc. for $53 million in cash and a stream of future payments. Liz Claiborne acquires roughly three companies a year, and chose to acquire Couture because it believed it had terrific potential to grow. It was impressed with the vision and energy of Couture's founders. Shortly after the acquisition, Couture

changed its corporate name to Juicy Couture, Inc.  One of the
effects of the acquisition is that Couture no longer relies on a
small factory base, but has expanded its manufacturing and
distribution system significantly and professionalized its back-
office operations.

S.   Couture's Efforts to Police its Marks in the United States

Beginning in February 2002, Couture took its first steps to
police its marks.  Two months later, Jacobson, who is Taylor's
sister, joined the company and assumed personal responsibility
for protecting Couture's intellectual property rights.  Jacobson
has an MBA and experience in the clothing industry.
Significantly, until it filed this lawsuit in 2004, Couture did
not oppose any Lancôme trademark application filed in the United
States, or object to any promotional activities, including either
the Juicy Gossip or Juicy Pop promotions.

Perhaps as early as 2000, but certainly by 2001, Taylor was
aware of Lancôme's JUICY TUBES.  Taylor decided that no action
was necessary since in her view Lancôme's use of the word Juicy
for a specific product name did not threaten Couture's interests.
Couture was also aware of Lancôme's introduction of JUICY ROUGE
in 2003, and again took no action.  Instead, its policing
activities during 2002 and 2003 were focused almost exclusively
on protecting its marks in connection with uses on clothing.

During 2002, outside counsel Irell & Manella LLP, a Los
Angeles law firm, sent four letters to entities that had filed

trademark applications for Super Juicy, Juicy Mama's, or 99percentjuicy for clothing, and for Slipi Juici for body lotions.  Irell also sent letters regarding the word Juicy appearing on a t-shirt offered at Bergdorf Goodman, and an advertisement for a knock-off jogging set.

In January 2003, Buchalter Nemer Fields & Younger, another Los Angeles law firm acting for Couture, sent a letter protesting the use of the word Thejuicystore on clothing.  In March 2003, Skadden, Arps, Slate, Meagher & Flom, the law firm representing Couture in connection with its acquisition by Liz Claiborne, sent a letter protesting the use of the mark Juicy Couture on t-shirts.  After the acquisition, Kramer Levin Naftalis & Frankel began to represent Couture.  That law firm sent its first letter in June 2003, protesting the attempt to register the mark Jewcy for clothing.  In October 2003, it sent a letter protesting the application to register the mark Juicy for candles.[15]  The policing activities in the United States between January and July 2004 consisted of an e-mail and a letter protesting sales of counterfeit clothing.

Couture did not file any opposition to Lancôme's applications to register Juicy marks in the United States until after the breakdown of negotiations over European trademark disputes in 2004, which is described next.  At trial, Taylor asserted that Lancôme's adoption of the mark Juicy Wear for its

_____

[15] Couture asserted that its February 28, 2002 application to register Juicy Couture for candles had priority.

33

lipstick products made her fear that Lancôme intended to extend its business into clothing. There is absolutely no basis in the evidence presented at trial to support that belief. She also asserted that Lancôme had entered "our world."

Couture filed its first opposition in the United States to Lancôme trademark applications on July 21, 2004, when it opposed Lancôme's applications to register both Juicy Stay and Juicy Last in the class for cosmetics. Since that time, Couture has opposed fifteen more PTO applications by Lancôme in the United States.

T.   Battle Beginning in February 2003 to Control the Juicy Mark in Europe

Despite the fact that Couture only recently entered the European market, Europe was the first battleground between Couture and Lancôme over trademark rights. Couture began selling its products to major accounts in France and Britain in late 2001 or so. Approximately two years later, on the eve of its acquisition by Liz Claiborne, Couture acted to oppose a Lancôme trademark application.

On February 28, 2003, Couture opposed Lancôme's application to register the word Juicy alone in France in the class for cosmetics.[16] Jacobson ordered Couture's French counsel to take this action because the application was for the single word Juicy, as opposed to the word Juicy in combination with another

_____

[16] Couture has not offered its opposition into evidence, but the filing of the opposition is undisputed.

word.  Given the imminent merger with Liz Claiborne and the hope
that this merger would permit Couture to expand its business
significantly, Couture executives believed that it was important
to protect their ability to develop a Juicy Couture perfume and
cosmetics line.

Lancôme wrote immediately to demand that Couture withdraw
its opposition, asserting that Lancôme had priority of rights
through its French registrations of the JUICY TUBES and JUICY
ROUGE marks for cosmetics.  Those marks were registered on
September 9, 1999, and June 21, 2002, respectively.

After consultation with its counsel, Couture decided that it
would instead try to work out a co-existence agreement with
Lancôme.  On June 13, Couture's European counsel wrote to
Lancôme, acknowledging that Couture had not opposed several of
Lancôme's applications in the United States and Europe to
register marks containing the word Juicy for cosmetics, and that
"a large number of third parties use the name JUICY" in
combination with other words for cosmetics "due to the fact that
the word 'juicy' evokes hydration."  It proposed that both
companies agree that they could each use marks containing the
word Juicy in the class of goods that included perfume and
cosmetics so long as neither of them would attempt to use the
word alone.  Lancôme did not reply to the letter, or to a follow-
up letter of July 10, or to telephone calls in August.

On October 1, 2003, Couture filed a second opposition in
France, this time to Lancôme's application to register Juicy Wear

in connection with cosmetics. Between October 6, 2003, and May 28, 2004, Couture filed four oppositions with the European Community Trademark Office ("CTM") to Lancôme's applications to register the marks Juicy, Juicy Touch, Juicy & Fresh, and Juicy Style, all of which Lancôme had filed in the class for cosmetics.

On February 9, 2004, the French Intellectual Property Office issued a preliminary or "draft" ruling in Couture's favor on its opposition to Lancôme's application to register Juicy Wear in France in connection with cosmetics and makeup products. In issuing this ruling, the trademark office attorney relied on the fact that Couture had already registered the mark JUICY COUTURE for cosmetics and makeup. France apparently does not require proof of a use in commerce in order to register a mark.

In May 2004, Couture's European counsel again sought a meeting with Lancôme's representatives. In preparation for a settlement meeting that occurred in July 2004, Couture sent Lancôme a proposal for settling all outstanding disputes and a document outlining its view of its European rights. The latter document listed each companies' registrations with the CTM and in France, and threatened action to oppose or cancel Lancôme's CTM and French registrations if a settlement were not reached. It asserted that Couture had the ability to restrict Lancôme's use and registration of Juicy to France alone. Couture does not assert rights in the United States in the document.

The proposed global settlement would allow Couture to sell cosmetics under the names Juicy Baby, Juicy Couture, Juicy Girl,

and the word Juicy with another word that unequivocally
designates apparel products.  Couture would not use the mark
Juicy alone.  Lancôme was permitted to use sixteen different
brand names using the word Juicy and to create new combination
marks, but could not use the mark Juicy alone or in combination
with a term that was described as a generic name of a product.
Six examples were given for the latter class of forbidden names,
including Juicy Wear.  No settlement was reached.

Following the failed settlement meeting, Couture filed an
action to cancel Lancôme's French trademark JUICY TUBES.
Beginning in September 2004, Couture opposed thirty-eight more
applications by Lancôme that were pending before the CTM.

U.    Couture's Plans to Expand into Cosmetics
Couture's founders hope to create a "life-style brand" that
will include all consumer products, even automobiles.  When
seeking a buyer for the company in 2002, they described their
expansion plans more modestly as follows: "The Company believes
the Juicy Couture brand could be an effective vehicle for a
complete line of coordinated accessories, including bags, belts,
casual footwear, swimwear, eyewear, and other fashion-oriented
items."

Among many other things, they hope to add a line of
fragrances with some associated cosmetics.  Indeed, when talking
with Liz Claiborne in 2002 about a proposed acquisition of their
company, the owners of Couture expressed that very desire to Liz

Claiborne executives but as already noted, disclosed that Lancôme was already using the brand name JUICY TUBES on a lip gloss. After the acquisition, Liz Claiborne explored adding a line of Couture cosmetics through licensing arrangements with other companies such as Estée Lauder and L'Oreal.  None of those efforts bore fruit.

It is not uncommon for successful clothing manufacturers to develop fragrance lines.  All of Couture's efforts to find a licensing partner, however, have met with disappointment.  Liz Claiborne is now developing a Juicy Couture fragrance internally and hopes to begin selling it in 2006.[17]

While successful clothing companies develop fragrance lines with some frequency, it is far less common for them to succeed in adding a line of women's cosmetics.  The plaintiffs have been able to identify only a few companies which have done so, each of which uses the name of the celebrity who was the designer of its clothing line, such as Chanel, as its brand name.


Conclusions of Law

Couture brings claims for trademark infringement of its registered marks under Section 32 of the Lanham Act, 15 U.S.C. § 1114 ("Section 32") and for infringement of its unregistered and common law marks under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 43(a)") and New York common law.  At their

_____

[17] Couture had hoped to begin sales of a line of fragrances in 2005.

core, the claims are premised on an extraordinary view of the breadth and strength of Couture's rights in the word juicy which cannot be sustained factually or legally. Because Couture has not met its burden and proved that Lancôme's uses of the word in connection with cosmetics are likely to cause confusion with Couture's marks, Couture's claims are rejected.

As already described, Couture has significantly reduced its claims in the course of this litigation. Its thinking about the trademark issues that form the heart of this case nonetheless remains confused. Its goal, as articulated at the time of the trial, is to co-exist in the cosmetics market with Lancôme. On the one hand, it wants to be able to use the word Juicy in marketing its own line of cosmetics, but does not seek to prevent Lancôme from using the brand names JUICY TUBES, JUICY ROUGE or Juicy Tubes Pop. In spite of that concession, however, it does object to Lancôme's use of the brand name Juicy Wear. Precisely what principle would permit this line to be drawn is hard to discern. This litigation is not the occasion to determine whether Couture's entry into the cosmetics field with brand names using the word Juicy would infringe on Lancôme's trademark rights, or even to determine the extent to which Lancôme has trademark rights in its entire Juicy line. All that must be determined is whether Lancôme's use of the brand name Juicy Wear and two promotional campaigns have infringed Couture's trademark rights.

<u>I. Lanham Act</u>

To sustain a claim for trademark infringement under Sections 32 or 43(a) a plaintiff must show that its mark is entitled to protection and that the defendant's use of the mark is likely to cause confusion. <u>Time, Inc. v. Petersen Publ'g. Co. LLC</u>, 173 F.3d 113, 117 (2d Cir. 1999). Couture has not shown that it has rights in any unregistered mark.

A. Rights in Mark

In this lawsuit, Couture asserts rights in its registered trademarks JUICY, CHOOSE JUICY and JUICY COUTURE, each of which was issued in connection with women's clothing ("Registered Marks").[18] Couture also claims that its t-shirt slogans Wear Juicy, Juicy Pop Princess, Be Juicy, Juicy Girls Rule, and the Joy of Juicy (the "Slogans") are marks entitled to protection as common law marks.

Registration of a trademark allows the owner to sue an infringer under Section 32 and creates a presumption that the mark is valid. <u>See</u> 15 U.S.C. § 1057; <u>see also</u> <u>Wal-Mart Stores, Inc. v. Samara Bros., Inc.</u>, 529 U.S. 205, 209 (2000). Lancôme does not contest Couture's rights in the Registered Marks.

Couture asserts rights in its five Slogans.[19] "An

_____

[18] JUICY and JUICY COUTURE are also registered for one or more of the following: knapsacks, luggage, bags, and jewelry.

[19] Although Couture asserts claims based on the Slogans it does not address either the legal or factual basis for these claims in its trial memoranda or its Findings of Fact and Conclusions of Law. It has left it to the Court to search the

unregistered mark is entitled to protection under the Lanham Act
if it would qualify for registration as a trademark." <u>Star</u>
<u>Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 381 (2d Cir.
2005). A mark is protectible if it is sufficiently distinctive
either through acquired distinctiveness or its inherent
distinctiveness to distinguish the plaintiff's goods from those
of others. <u>Id.</u> Of course, no mark is entitled to protection if
a company's "competitors must be able to use [it] in order to
effectively communicate information regarding their products to
consumers." <u>Id.</u> at 382.

> [A] mark is inherently distinctive if its intrinsic
> nature serves to identify a particular source. In the
> context of word marks, courts have applied the now-classic
> test originally formulated by Judge Friendly, in which
> word marks that are "arbitrary" ("Camel" cigarettes),
> "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry
> detergent) are held to be inherently distinctive.

<u>Wal-Mart Stores</u>, 529 U.S. at 210-11 (citation omitted).

Inherently distinctive marks "almost <u>automatically</u> tell a
customer that they refer to a brand." <u>Qualitex Co. v. Jacobson</u>
<u>Prod. Co.</u>, 514 U.S. 159, 162-63 (1995). Descriptive marks are
those marks that "describe a product or its qualities,
ingredients or characteristics." <u>Playtex Prods., Inc. v. Georgia</u>
<u>Pacific Corp.</u>, 390 F.3d 158, 163 (2d Cir. 2004) (citation
omitted). Descriptive marks are only entitled to protection if
they acquire secondary meaning. <u>Id.</u> Secondary meaning exists
where "the public is moved in any degree to buy an article

---

record to locate any evidence that might support the existence of
these claims, and to gather any legal authority that might
support its assertion.

because of its source." <u>Genesee Brewing Co., Inc. v. Stroh Brewing Co.</u>, 124 F.3d 137, 143 n.4 (2d Cir. 1997) (citation omitted).  Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." <u>Id.</u> (citation omitted).  "A design used in conjunction with other marks is separately protectible in its own right if it creates a separate and distinct impression from the impression created by the other marks." <u>Star Indus.</u>, 412 F.3d at 382.

Couture has not shown why any one of the Slogans would be perceived as an indicator of source.  T-shirts are a particularly ineffective medium through which to establish an inherently distinctive mark.  In our culture, t-shirts often serve as personal billboards, carrying phrases that convey meanings that can range from the entirely personal to political to humorous.

The only evidence presented to establish secondary meaning in the Slogans was testimony that photographs of then-pop princess Britney Spears wearing a t-shirt bearing the Slogan Juicy Pop Princess appeared in the press.  The probative value of that testimony is significantly weakened by the failure of Couture to provide even one piece of documentary evidence of that media coverage.  Couture also failed to provide any evidence of its actual sales of clothing bearing any of the Slogans.  There

42

is, therefore, no evidence of when t-shirts bearing the Slogans were sold, how many were sold, or where they were sold.

Couture's failure to show that it has trademark rights in the Slogans is not surprising. When Couture identified a word or phrase as a mark that it wished to use as a source identifier, it took steps to register the mark. It never considered any of the five Slogans as any more distinctive than the myriad of other slogans it adopted for a season and then abandoned. The remainder of this Opinion will therefore address Couture's claims that Lancôme infringed the Registered Marks.


B.    Likelihood of Confusion

Couture brings two Lanham Act claims concerning its Registered Marks. It asserts (1) that Lancôme's sales beginning in 2004 of the lipstick duo Juicy Wear infringed these marks and (2) that the 2003 Juicy Gossip and 2004 Juicy Pop promotions infringed its marks, although the sales of Lancôme's Juicy products that accompanied these promotions were not infringing. The latter claim will be addressed after a discussion of the Juicy Wear claim.

Couture claims infringement of its Registered Marks despite the fact that none of those marks are for cosmetics. The various protections that are created by a registered trademark are generally limited to the use of the mark "in connection with the goods or services specified in the certificate...." 15 U.S.C. § 1057(b). Nonetheless, a trademark owner has "rights against use

on related, non-competing products...in accord with the realities of mass media salesmanship and the purchasing behavior of consumers." Scarves by Vera, Inc. v. Todo Imps. Ltd. (Inc.), 544 F.2d 1167, 1172 (2d Cir. 1976). The extension of trademark protection to related products guards against improper restraints on the "possible expansion of the senior user's market, including consumer confusion, tarnishment of the senior user's reputation, and unjust enrichment of the infringer." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987). The market for cosmetics is sufficiently related to the field of women's clothing to merit an inquiry into whether Lancôme's products are likely to cause confusion with Couture's marks. See Scarves by Vera, 544 F.2d at 1174.

To establish that Lancôme's sale of Juicy Wear is likely to cause confusion with the Registered Marks, Couture must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." Playtex, 390 F.3d at 161 (citation omitted). Confusion giving rise to a claim of trademark infringement includes confusion as to "source, sponsorship, affiliation, connection, or identification." Star Indus., 412 F.3d at 383 (citation omitted). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." Id. at 384 (citation omitted). Affiliation confusion exists where use of a "unique and recognizable identifier" could lead consumers to

44

"infer a relationship" between the trademark owner and the new product.  Id. (citation omitted).  Couture's trademark claims are premised on a theory of affiliation confusion.

The determination of whether a plaintiff has established likelihood of confusion is guided by the eight-factor balancing test introduced by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961).  The eight factors are: 1) strength of the trademark; 2) similarity of the marks; 3) proximity of the products; 4) evidence that the senior user may "bridge the gap" into the market occupied by the alleged infringer's product; 5) evidence of actual confusion; 6) evidence that the junior mark was adopted in bad faith; 7) respective quality of the products; and 8) sophistication of consumers in the relevant market.  Star Indus., 412 F.3d at 384.  "No single factor is dispositive, nor is a court limited to consideration of only these factors."  Brennan's, Inc. v. Brennan's Rest., LLC, 360 F.3d 125, 130 (2d Cir. 2004).  Each factor is considered in the context of how it fits into the ultimate question of the likelihood of confusion.  Id.  The analysis is not "mechanical" but should look at products "in their totality."  Star Indus., 412 F.3d at 384.

Juicy Wear

1)    Strength of the Trademark

The strength of a mark is a measurement of its "ability to identify the source of the goods being sold under its aegis."

Brennan's, 360 F.3d at 130. There are "two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." Id. at 130-31.

The measurement of a mark's inherent strength draws on the same classification system used in deciding whether a mark qualifies for trademark protection at all. Again, "[m]arks are classified, in ascending order of strength, as 1) generic; 2) descriptive; 3) suggestive; or 4) arbitrary or fanciful." Star Indus., 412 F.3d at 384-85 (citation omitted). A "term may shift from one category to another in light of differences in usage through time, because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976); see also Genesee Brewing, 124 F.3d at 147.

Arbitrary or fanciful marks are accorded "broad, muscular protection" under the law. Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 147 (2d Cir. 2003). Suggestive marks are "at best moderately strong" and are afforded less protection in the absence of secondary meaning. Star Indus., 412 F.3d at 385. Differentiating between the different types of marks serves to enhance market efficiency in two important ways. First, by reserving the strongest protection for arbitrary and fanciful marks, trademark law allows producers to protect the goodwill they establish for their products without depriving consumers and

46

producers of a full range of discourse about other goods offered in the marketplace. <u>Virgin Enters.</u>, 335 F.3d at 147. Second, by protecting more arbitrary marks, there is a greater chance that all the goods offered under that mark will come from a single source, thereby avoiding potential confusion. <u>Id.</u> at 148. The more unusual a mark, the less likely it is that two independent entities would choose it. <u>Id.</u> For example, "[c]onsumers who see the word <u>delicious</u> used on two or more food products are less likely to draw the inference that they must all come from the same producer." <u>Id.</u>

Couture's Registered Marks are descriptive and not inherently distinctive. Juicy has several distinct meanings including "full of or abounding in juice; succulent" and "[s]uggestive, [especially] in a sexual way; piquant, racy, sensational." <u>Oxford English Dictionary</u> (2d Ed. 1989).[20] It does not take any imaginative leap to connect Couture's "close and sexy fits" to the latter definition. Couture prides itself on designing women's clothing that is sexy, even racy, and its brand names underscore that identity.

Similarly, juicy is either descriptive or at best suggestive when applied to cosmetics. When juicy is defined as succulent, it takes little imagination to make a connection between the term and a product that would be applied to the lips. Lancôme's use

---

[20] Juicy has also been used to signify "[h]aving rich colouring suggestive of a moist surface" although this definition, which was used in art criticism in the late 19th century, is somewhat antiquated. <u>Oxford English Dictionary</u> (2d Ed. 1989).

of juicy is built on this connection.  Its advertisements for its Juicy products refer to "mouth watering shine" and "just picked juicy sweetness."  When used to convey shine, which is its principal use by Lancôme in the United States, juicy is barely suggestive in the world of cosmetics and not entitled to strong protection based on inherent distinctiveness.

A trademark's strength is also measured by "fame or acquired distinctiveness." Id. (citation omitted).  "If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use." Id.  The factors that are considered in assessing a mark's secondary meaning were listed above.

Couture's primary evidence of secondary meaning is derived from its unique approach to the promotion of its marks.  Couture eschews traditional advertising.  Instead it directs its attention toward winning celebrity endorsements and inviting attention by the mass media.  The evidence is mixed as to whether this marketing strategy has contributed in any significant way to brand awareness.  The media coverage of celebrities wearing Couture brands, whether on television, in movies, or in their personal lives, rarely includes any mention of the words Juicy or Juicy Couture.  The products themselves are generally unmarked. At some point in time which it has failed to identify, Couture adopted a "J-pull", a small zipper pull shaped in a J, for garments with a zipper.  This is too small a detail to be

noticeable in ordinary media coverage.[21]  Thus, for the most part, in order to recognize the clothes and to associate those clothes with Couture, or with one its marks such as JUICY, a viewer already would have to be familiar with Couture's products. Nonetheless, by at least 2003, Couture was receiving significant media attention in magazines that specifically identified its clothing, on occasion as it was being worn by a celebrity.

While Couture's sales grew steadily between 1999 and 2002, Couture has not shown what percentage of those sales were associated with one of the several Couture labels in any given year.  It was only with its acquisition by Liz Claiborne in 2003 that Couture's sales first approached $100 million.  In 2004, the year Lancôme's Juicy Wear appeared on the market, Couture's wholesale sales were over $170 million.  While Couture has not pointed to record evidence of the extent to which the 2003 and 2004 sales were in the United States or were for products other than clothing, it appears fair to conclude that a significant percentage reflects United States sales, and that the largest source of revenue remained women's clothing sales.  These are significant sales and reflect brand awareness.

Couture has not sold any cosmetics or fragrance.  Couture has done no studies to measure consumer awareness of its Registered Marks.  There is modest evidence of efforts to plagiarize Couture's marks.  As for length and exclusivity of the

---

[21] Couture has also failed to show that the J-pull has any secondary meaning to consumers.

mark, the Registered Marks are relatively young marks.

To summarize, whatever strength adheres to the Registered Marks, it is limited to women's clothing.[22] The Registered Marks are descriptive when applied to clothing. Strength of mark favors Couture, but not overwhelmingly so.

2) Similarity

When the secondary user's mark "is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them." Virgin Enters., 335 F.3d at 149. In making that assessment "courts look to the overall impression created by the logos and the context in which they are found and consider the totality of the factors that could cause confusion among prospective purchasers." Star Indus., 412 F.3d at 386 (citation omitted). The Second Circuit has "repeatedly found that the presence of a distinct brand name may weigh against a finding of confusing similarity." Playtex, 390 F.3d at 164 (collecting cases). Nonetheless, in some circumstances, "the addition of a trade name does not necessarily alleviate the problem of confusion of marks, and indeed, can aggravate it, as a purchaser could well think plaintiff had licensed defendant as a second user." Id. at 165 (citation omitted). This is particularly true if the parties are competitors. See A.T. Cross

---

[22] While Couture sells men's clothing, baby clothes, and clothing accessories, it has not argued or presented accessible evidence that its Registered Marks have acquired secondary meaning in such categories.

<u>Co. v. Jonathan Bradley Pens, Inc.</u>, 470 F.2d 689, 692 (2d Cir. 1972); <u>W.E. Bassett Co. v. Revlon, Inc.</u>, 435 F.2d 656, 662 (2d Cir. 1970).  Where the junior and senior marks are not identical, however, the presence of a brand name "will tend to militate <u>against</u> a finding of confusion."  <u>Playtex</u>, 390 F.3d at 165.

When viewed as a whole and in context, there is little similarity between Lancôme's and Couture's uses of Juicy. Lancôme does not use the Registered Marks JUICY COUTURE or CHOOSE JUICY.  Lancôme's Juicy Wear lipstick does have as its first word of the product name, a word that is identical to Couture's Registered Mark JUICY.  The similarity of the marks ends there. Couture uses its Registered Marks on clothing labels, hang tags, and occasionally to decorate items of clothing.  It has not identified any stylization of its mark that is similar to Lancôme's mark.

As will be discussed in more detail below, Lancôme uses the product name Juicy Wear on its packaging and lipstick product in a way that is entirely consistent with the packaging and naming of every Lancôme cosmetics product.  Lancôme does not sell clothing or use this mark in connection with clothing.  The packaging for Juicy Wear and the product itself prominently display the Lancôme name and Lancôme's rose design.  Considering the context in which a consumer purchases Lancôme's Juicy Wear, it is significant that Lancôme products, including Juicy Wear, are sold exclusively at Lancôme counters or sections of stores (or through a Lancôme website), where the most prominent mark is

the house brand Lancôme, reinforcing the message that the source of Juicy Wear is Lancôme.

It is also unlikely that a consumer would mistakenly believe that Lancôme's use of the mark Juicy Wear indicates a co-branding relationship.  Couture does not use the mark Juicy Wear.  Couture has not shown that cosmetics and women's apparel are so closely related that a likelihood of confusion is enhanced.  Indeed, its expert Johnson opined that clothing and cosmetics are not related other than by the fact that both products are sold in department stores.  Only a handful of the thousands of clothing companies have been able to maintain a presence in both markets, usually clothiers that have built a housemark based on a designer's famous name, for example Dior.  If this were a co-branding venture, a consumer would expect Lancôme to more clearly and explicitly link Juicy Wear to Couture in order to derive the presumed benefits of the endorsement.  Instead, the natural association and apparent link is with Lancôme's established line of Juicy cosmetics, each of which uses the word Juicy as the first word of a two or three word product name.  Again, there is no claim here that the sale of any of the five Lancôme Juicy products that preceded Juicy Wear infringed the Registered Marks.

The nature of Couture's mark JUICY also undercuts any impression of co-branding.[23]  Juicy is an adjective with strong

_____

[23] When Couture engages in co-branding, it leaves the consumer in little doubt as to its involvement.  This practice stands in sharp contrast to the impression created by Lancôme's product Juicy Wear.

descriptive elements when applied to either clothing or cosmetics. For Couture, Juicy describes the sexy styling of its clothing. For Lancôme, Juicy evokes moistness and shine, which may be attractive qualities for a lipstick. Lancôme has combined the word "Juicy" with the word "Wear", another term with an independent meaning for cosmetics; it conveys the message that this is also a long-lasting lipstick. Lancôme's choice of the word Juicy for a product name is thus utterly unremarkable and would not be likely to suggest co-branding. In contrast, if Couture had chosen an arbitrary mark, or one that had no utility in describing the quality of a lipstick, then Couture's co-branding argument would have more force.

In sum, Couture's Registered Mark JUICY is one of the two words in Lancôme's product name Juicy Wear. Given the prominent display of Lancôme's house brand on the product and in the locations where Juicy Wear is sold, and the consistent use of Lancôme's trade dress for all of its products, as well as the distance between the markets for cosmetics and women's clothing and Lancôme's established line of Juicy cosmetics, the similarity of the marks factor strongly favors Lancôme.


3)    Proximity

Proximity evaluates the "proximity of the products being sold by the plaintiff and defendant under identical (or similar) marks." <u>Virgin Enters.</u>, 335 F.3d at 149. The inquiry includes both market and geographic proximity. <u>Brennan's</u>, 360 F.3d at

134.  Market proximity asks "whether the two products are in related areas of commerce" while geographic proximity looks to "geographic separation of the products." Id. "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." Id.

Lancôme's Juicy Wear and Couture's clothing are sold in similar stores and target similar consumers.  Lancôme's products are primarily sold in high-end department stores and in stores that specialize in cosmetics.  Couture also sells it products in high-end department stores, although department stores account for less that one third of the locations in which its products are sold.  Couture's products are largely sold at clothing boutiques.  While Lancôme's average customer, including those purchasing Juicy Wear, is very likely older than Couture's, both companies seek to attract the younger woman.[24]  While both Couture and Lancôme sell their products in the United States, there has been little or no evidence of the depth of those sales in any region or state.  Given that an overlap in both the stores where their products are sold and in the customer bases increases the likelihood of confusion, proximity favors Couture.

4)   Bridging the gap

"'Bridging the gap'" refers to the likelihood that the senior user will enter the junior user's market in the future, or

---

[24] Couture has not pointed to any figures identifying the percentage of its sales attributable to department store sales or younger customers.

that consumers will perceive the senior user as likely to do so."
Star Indus., 412 F.3d at 387. "This factor is designed to
protect the senior user's interest in being able to enter a
related field at some future time." Savin Corp. v. Savin Group,
391 F.3d 439, 459-60 (2d Cir. 2004) (citation omitted).

Couture is the senior user of the mark Juicy. It began
using the mark in 1996, and achieved registration of the mark in
1999. Lancôme sold its first Juicy product -- JUICY TUBES -- in
2000, and registered that mark in 2001. Couture has shown that
it would like to enter the cosmetics market but has not shown
that it is likely to enter the cosmetics market. Couture already
attempted to add a cosmetics line through a licensing arrangement
with an established cosmetics producer but was unable to find a
willing partner.[25] Given the rarity with which clothing
companies create cosmetics lines, consumers would likely perceive
that Couture might be able to enter that business, but would have
little expectation that Couture would actually do so. Likelihood
of "bridging the gap" favors Couture, but only marginally.


5)   Actual Confusion

Actual confusion need not be shown to prevail under the
Lanham Act "since actual confusion is very difficult to prove and
the [Lanham] Act requires only a likelihood of confusion as to
source." Id. at 459 (citation omitted). Although it is not a

---

[25] Even Couture's entry into the fragrance market has been
delayed. It is now slated to happen later this year.

requirement, "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." Virgin Enters. 335 F.3d at 151. Evidence of actual confusion is particularly relevant to the Polaroid inquiry. Id. Couture principally seeks to show actual confusion through a survey done by Johnson.[26]

Couture asked Johnson in May 2005 to design and conduct a consumer study to measure the extent to which consumers, when exposed to either the name Juicy or Juicy Wear in the context of shopping for makeup, may believe that the makeup products come from or are associated with Couture. To do so, Johnson created three 8 ½ by 11 inch laminated cards bearing the words Juicy, Juicy Wear, or Glossy Wear. In September 2005, each of these three cards was separately shown in a shopping mall to over 200 teenage and adult females between the ages of sixteen and thirty-

---

[26] Couture has identified two emails that it received asking for information on cosmetics. One was apparently in response to a radio advertisement in 2004; the other was in response to a television advertisement in March 2005 about an "all day lip gloss." There has been no evidence of any television advertising by Lancôme.

Given the volume of Lancôme's sales, these two emails are the sort of de minimis anecdotal evidence that will not support a finding of actual confusion. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001). But see Virgin Enters., 335 F.3d at 151 (finding that affidavit recounting customer inquiries weighed in favor of preliminary injunciton). Couture points to Morningside Group Ltd. v. Morningside Capital Group LLC, 182 F.3d 133, 141 (2d Cir. 1999), as offering further support for the proposition that misdirected communication can support a finding of actual confusion, but there the evidence of misdirected telephone calls and inquiries was "extensive."

nine[27] who since June 2005 had purchased both a cosmetics item that costs over $15 and an item of clothing that costs $50 or more, and who had shopped at a major department store. Altogether, 613 interviews were conducted.

After surviving initial screening questions, the respondents were told, "Here is something that you might see if you were shopping for makeup and cosmetics in a department store." The respondents were then asked, "If you were shopping for makeup and cosmetics in a department store and encountered a product called [Juicy Wear/Juicy/Glossy Wear] do you or do you not have a belief about who or what company or companies makes or puts out [Juicy Wear/Juicy/Glossy Wear]?" Additional questions probed the understanding of those who answered yes. 28%, 37%, and 19% of the respondents said that they had a belief regarding sponsorship of Juicy Wear, Juicy, and Glossy Wear, respectively.[28] When asked to identify the source, 18% of the respondents shown the Juicy Wear card identified Couture, and 2% identified Lancôme. 19% shown the Juicy card identified Couture, and 8% identified Lancôme. 1% shown the Glossy Wear card identified Couture, and 2% identified Lancôme. When the responses to two additional questions[29] that were also posed are added to these responses,

---

[27] Johnson instructed the company that executed the survey that two-thirds of the respondents were to be between twenty-five and thirty-nine.

[28] Johnson contends that the statistical error rate for the study falls into the range of plus or minus 5.5%.

[29] The additional questions were "And, if you encountered a makeup or cosmetic product called [] do you or do you not know of

Johnson computes that 22% identified Juicy Wear cosmetics as coming from Couture, 27% identified Juicy cosmetics as coming from Couture, and only 1% identified Glossy Wear cosmetics as coming from Couture.

Johnson concludes from these results that "it is clear" that the use of the names Juicy Wear or Juicy "to promote" cosmetics and makeup products causes "a significant likelihood of confusion such that consumers who encounter such products, either post-sale or point-of-sale, falsely believe that these cosmetic and makeup products come from Juicy Couture, or are put out in association with Juicy Couture." Johnson contends that his conclusions are valid for and can be extrapolated to the combination of the word Juicy with any other brand name used by Lancôme, such as Juicy Tubes and Juicy Vernis, and that combining the term Wear in particular with the term Juicy does not increase the likelihood of confusion.

While Lancôme's motion to strike this testimony pursuant to Rules 702 and 403, Fed. R. Evid., was denied, the arguments Lancôme made in support of that motion are largely valid. Survey evidence is generally admissible to establish actual confusion in cases alleging violations of the Lanham Act. <u>Schering Corp. v. Pfizer Inc.</u>, 189 F.3d 218, 227-28 (2d Cir. 1999). To be probative a survey must be "directed to the relevant issues."

---

any other product or products made or put out by whoever makes or puts out []?", and "Do you believe that whoever makes or puts out [] is or is not related to, sponsored by, or associated with any other company or source?".

Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994) (citation omitted).  When survey evidence is used to prove the state of mind of a prospective purchaser "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2006); see also Am. Footwear Corp. v. Gen. Footwear Co. Ltd., 609 F.2d 655, 660 n.4 (2d Cir. 1979).  The fact that a senior user has yet to produce a competing product does not excuse a survey's failure to present the junior user's product "under actual marketing conditions." Am. Footwear Corp., 609 F.2d at 660 n.4.

The Johnson survey has no value on the issue of actual confusion because of fundamental flaws in its design.  Most significantly, the survey did not replicate the marketplace conditions in which consumers encounter Lancôme's products. Lancôme's cosmetics are sold at Lancôme counters or department store sections, or over websites, with prominent signage identifying Lancôme as the seller, and the products as Lancôme products.  Lancôme products are also packaged in both boxes and a product container that identify them as Lancôme products.  The failure to replicate marketplace conditions is particularly troubling since Johnson has designed over 300 likelihood of confusion surveys, and this is the only such survey conducted with face-to-face interviews in which he did not show the product to the respondents, either through a picture or display.

Essentially, the survey was a word association test, in which respondents were shown a card with the word Juicy and repeatedly asked questions in which the word Juicy appeared, often not just once but twice in the same question. See Playtex, 390 F.3d at 168 (rejecting index card survey that failed to display products as they are "presented and packaged").

Johnson justified his decision not to show the Lancôme products to respondents with the assertion that showing the actual products, which of course bear the name Lancôme and Lancôme's rose design, would "mask confusion." He feared that respondents, reading the word of a well-known brand like Lancôme on the product, would identify Lancôme as the source of the product. This is essentially an admission that someone viewing the actual Lancôme product would not be confused as to source.

Johnson further explained that his design was driven by the fact that Couture and Lancôme are not competitors: Couture does not sell cosmetics, and cosmetics and clothing are in his view "not related". Because they are not competitors he believed that he had to measure something he called subliminal or inchoate confusion instead of using customary survey design to measure "classic" confusion. As a consequence, he designed a study to measure consumer reaction to a list of terms, either Juicy alone or Juicy in combination with another word. Johnson may have been misled in this regard by judicial criticism of his other

surveys.[30]

The bias created by this faulty design was exacerbated by the choice of the universe of respondents. The pool of respondents was skewed towards a younger population to obtain a higher proportion of respondents who are familiar with Couture, as opposed to choosing a universe that mirrors Lancôme's customers generally or even the purchasers of its Juicy cosmetics or Juicy Wear. For instance, one-third of the survey respondents were between the ages sixteen and twenty-four. When it comes to Juicy Wear, almost three-quarters of Lancôme's customers who purchase that product are over the age of thirty-four.

Also, by asking an introductory question about clothing, which Johnson admits was unnecessary, there was a not so subtle suggestion that the survey was connected to clothing in some way. Since Johnson included a screening question at the end of the survey to learn whether anyone in the respondent's household

---

[30] In <u>Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.</u>, 875 F. Supp. 966 (E.D.N.Y. 1994), Johnson conducted two surveys for a defendant that were intended to measure actual confusion in a claim of trademark infringement brought by the owner of the mark BOAR'S HEAD for deli meats against a brewer of a beer marketed as "Boar's Head Red". One survey was a national telephone survey that asked questions about "Boar's Head Red Beer." The second survey was conducted in-person. <u>Id.</u> at 973-74. Both of Johnson's surveys were severely criticized by the well-respected District Judge, <u>id.</u> at 980-82, but it was only the telephone survey that was criticized for failing to measure "subjective and inchoate" confusion. <u>Id.</u> at 980. It is unnecessary to attempt to discern what implications that criticism might have here since there is no telephone survey in this case. Here, for entirely separate reasons, Johnson utterly failed to conduct a survey that reliably measures any relevant issue.

worked for a manufacturer, distributor or retailer of clothing, there was no need to include the introductory question except to plant a suggestion about clothing.

It is particularly remarkable that Johnson included no control for testing the word Juicy alone.  It is unnecessary, however, to dwell on the implications of this design error since Lancôme does not use the word Juicy alone on its products and this portion of the survey is essentially irrelevant.

Although Johnson contends that his survey was a test of post-sale confusion, and is a reliable measure as well of point-of-sale, pre-sale, and initial interest confusion, dilution, and co-branding, the survey actually measures none of these categories.  Post-sale confusion results when other consumers observe the defendant's products being used after sale and associate those products with the plaintiff.  <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867, 872-73 (2d Cir. 1986); <u>see</u> <u>also</u> <u>Nabisco, Inc. v. PF Brands, Inc.</u>, 191 F.3d 208, 218 (2d Cir. 1999).  Although Johnson contends that the survey was designed as a test of post-sale confusion, it in fact begins with the statement "Here is something that you might see if you were shopping for makeup and cosmetics in a department store."[31] The respondents were asked, therefore, to consider this a point-of-sale survey, and yet the survey design did nothing to

---

[31] Of course, this statement was false, particularly when the card shown the respondent contained just the word Juicy. Lancôme does not have a product bearing the name Juicy alone.

replicate the point-of-sale experience.

The survey says as little about post-sale confusion.  As noted, there is no Lancôme product with the brand name Juicy.  In a post-sale context a potential customer observing someone using Lancôme's Juicy Wear product would see two items, each clearly identifying the product as Lancôme's.  The lipstick unit comes in Lancôme's signature silver metal tube with the rose design on its side and the name Lancôme embossed twice on the top of the slender tube.  The name Juicy Wear appears in infinitesimally small script on the bottom of the tube.  The top coat comes in a clear plastic tube with a dark grey cap.  The front of the tube reads

LANCÔME<br>
PARIS<br>
[rose design]

JUICY WEAR

Seal and Shine<br>
Top Coat

Top Coat<br>
Film Miroir

The Lancôme name is in the largest letters; the brand name Juicy Wear is in the second largest type.  The back of the tube has the name Lancôme appearing twice, although not prominently, and no reference to the product name.

While there were other problems with the Johnson survey, the issues already discussed prevent the survey from contributing any meaningful information about the likelihood of actual confusion from Lancôme's use of the name Juicy Wear for a lipstick.  This

survey is so fundamentally flawed, that it would have been excluded from evidence at a jury trial.

There is a second survey that was offered into evidence. Lancôme chose a renowned expert to design its study. Jacoby designed a survey for Lancôme to test the extent to which use of the word Juicy in connection with Lancôme products was likely to cause confusion as to the origin of the products. Over 200 respondents who were at least twenty-five years old in this shopping mall survey were shown an array of six Lancôme products from the Juicy line in their Lancôme boxes and asked to treat the experience "as if you were shopping for a lip or nail care product and came across these items."[32] The respondents were invited to handle the boxes and examine the products if they wished to do so. The products were then covered, and the respondents were asked a series of questions. Approximately 2% of the respondents exhibited any confusion, and only in response to an exhaustive list of questions at the end of the survey that sought to tease out any impression of co-branding. 98% did not mention Juicy in answer to any of the questions that were asked.

The Jacoby survey has a singular advantage over the Johnson survey. The Jacoby survey actually sought to replicate the shopping experience and test whether consumers were confused by Lancôme's product names. It found negligible, if any, evidence

---

[32] The products were Juicy Tubes, Juicy Rouge, Juicy Vernis, Juicy Crayon, Juicy Wear and Juicy Tubes Pop. At the time of the survey, Couture was still contending that Lancôme's sale of each of these products infringed its rights.

of confusion.[33]

Couture has failed to show the existence of actual confusion from Lancôme's sale of Juicy Wear.  The actual confusion factor favors Lancôme.


6)  Bad Faith

The inquiry into willfulness or bad faith "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." Savin Corp., 391 F.3d at 460 (citation omitted).  The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith, even in the total absence of a trademark search," although bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." Star Indus., 412 F.3d at 388-89.  Where there is evidence of a junior user's knowledge of an earlier mark, courts have, on occasion found good faith "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation." Id. at 388.  Some of the actions by a defendant that are considered affirmative evidence of good faith are "selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on advice of

_____

[33] It is unnecessary to spend time addressing Couture's attacks on the Jacoby survey since Couture has failed to show any actual confusion and it carries the burden to do so.  Suffice it to say that the attacks on Jacoby's well-designed survey were strained and unpersuasive.

counsel." Id.

Couture has not established that Lancôme acted in bad faith.
Indeed, faced with overwhelming evidence that Lancôme adopted the
mark Juicy in absolute ignorance of Couture's business or name,
and in utter good faith, Couture finally admitted during
summation that Lancôme had acted in good faith through the year
2003. Given Lancôme's considerable investment in its Juicy
franchise for the five years from 1999 through 2003, and its good
faith development of the five Juicy products that preceded the
introduction of Juicy Wear, Couture is confronted with the
difficult task of explaining why Lancôme, in adopting the mark
Juicy Wear in the sixth year for a sixth Juicy product, was
suddenly motivated to capitalize on Couture's reputation.

Couture argues that the term "Juicy Wear" is materially
different from the other Juicy products because the term wear
connotes clothing. But wear is also commonly used with cosmetics
to describe products that are long-lasting, which is the quality
that Lancôme hoped to convey by naming its product Juicy Wear.
Lancôme only adopted the name Juicy Wear after research
confirming its meaning for consumers. In addition, because the
word wear accurately reflects a characteristic of the product in
question, it actually serves as affirmative evidence of Lancôme's
good faith. See id. Even Couture's survey expert took the view
that the word Wear when combined with Juicy added no additional
likelihood of confusion.

Couture has no trademark rights in the word wear[34] and has not introduced any evidence that suggests wear was chosen with an intent to connote clothing, or more specifically to try to exploit any goodwill associated with Couture's Registered Marks. While Couture points to evidence that by 2004 it was achieving significant sales and publicity, it has not shown that Lancôme ever focused on Couture's growing popularity or considered that it would be of assistance to Lancôme to ride the coattails of that phenomenon. Lancôme studies cosmetics trends and its competitors within the cosmetics industry intently; there is not a whiff of evidence that it considers clothing companies to be its competitors or to be brands from which it could obtain value.

Couture also points to Lancôme's failure to run a trademark search before applying to register the name Juicy Wear with the PTO. Lancôme ran trademark searches for the first five of its Juicy products. The last three of those searches occurred in October 2003; Lancôme applied to register Juicy Wear in January 2004. By that time, Lancôme had successfully registered JUICY TUBES without opposition from the plaintiffs, and Lancôme's application to register the mark JUICY ROUGE had been published for opposition in November 2003 without the PTO citing any conflicting marks.

Failure to perform a trademark search, standing alone, does not prove bad faith, even where a defendant is aware of other

---

[34] As already discussed, Couture's occasional use of the slogan "Wear Juicy" on a t-shirt did not create trademark rights in the slogan.

products using similar names.  <u>Streetwise Maps, Inc. v. Vandam,</u>
<u>Inc.</u>, 159 F.3d 739, 746 (2d Cir. 1998).  Given its earlier
searches and its experiences with its applications to register
JUICY TUBES and JUICY ROUGE, the failure to conduct a sixth
search does not give rise to any inference of bad faith.

From the search conducted for JUICY ROUGE in June 2003,
Lancôme was aware that Couture had applied to register the Juicy
Couture and Juicy Jeans marks in eleven classes of goods,
including cosmetics.[35]  A desire to enter the field of cosmetics
is an entirely different phenomenon from actually entering the
field, as Couture has certainly learned.  Lancôme was entitled to
consider Couture's failure in 2001 to oppose its application to
register JUICY TUBES, and its failure in 2003 to object to the
introduction of JUICY ROUGE through the Juicy Gossip promotional
campaign.  Even "[f]ull knowledge of a prior use of a protected
mark is not necessarily inconsistent with a finding of good
faith, particularly where the alleged infringer is unsure as to
the scope of the protection."  <u>Cadbury Beverages, Inc. v. Cott</u>
<u>Corp.</u>, 73 F.3d 474, 483 (2d Cir. 1996).

Couture has failed to show Lancôme's bad faith in the
adoption of the mark Juicy Wear.  This factor strongly favors
Lancôme.

---

[35] The European battle to control the mark Juicy will be
discussed in connection with Lancôme's affirmative defense of
laches.  Suffice it to say that that battle does not support an
inference of bad faith.

7)   Quality of the Products

A difference in the quality of the infringed and accused goods goes more to the harm that confusion can cause to plaintiff's mark than it does to the likelihood of confusion. Virgin Enters., 335 F.3d at 152.  A marked difference in quality would "militate against finding a likelihood of confusion" as customers are less likely to assume a high quality senior user would produce low-quality products.  Star Indus., 412 F.3d at 389.  The parties agree that Lancôme's products are of good quality.  This factor favors Couture.


8)   Sophistication of Consumers

The inquiry into consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  Id. at 390 (citation omitted).  Consumer sophistication has to be analyzed in relationship to the type of confusion being asserted by the plaintiffs.  See id.  In evaluating an action for trademark infringement brought by a vodka maker against a competitor using a similar trademark for rum, the Second Circuit noted that the question of sophistication did not go to "whether consumers are capable of distinguishing rum from vodka" but whether they were sophisticated enough to understand that a similar stylized "O" on the bottle of two different brands of alcohol was "not indicative of a licensing or sponsorship

agreement" between the brands.  Id.

Because Couture's claims are premised on confusion through co-branding, the relevant consumers would have to be familiar with Couture.  Consumers who are aware of Couture are fashion conscious.  Such consumers are likely to be relatively sophisticated shoppers.  Similarly, consumers of cosmetics and in particular purchasers of lipstick, are likely to examine with care the products they apply to their skin and lips.  The sophistication of customers and the attention they are likely to pay to the cosmetics they purchase make it less likely that those familiar with the Couture brand would think that Lancôme's Juicy Wear was the product of a co-branding relationship between Couture and Lancôme.  The fashion-conscious shopper that is the target of Couture's marketing efforts would be unlikely to connect the up-and-coming California clothing company known for its t-shirts, jeans and tracksuits with the elegant sensuality of the French cosmetics giant because Lancôme named its product Juicy Wear.  Sophistication of consumers favors Lancôme.

To summarize, several of the eight Polaroid factors favor Couture.  Most significantly, however, the lack of similarity in the marks as they are presented in the marketplace and the absence of bad faith, strongly favor Lancôme.  Based on an analysis of all the relevant evidence, there is no basis to find that the product name Juicy Wear is likely to cause confusion with Couture's Registered Marks.

<u>Lancôme's Juicy Promotions</u>

In addition to its claim based on Lancôme's use of the mark Juicy Wear, Couture asserts that Lancôme infringed its rights by using the words juicy, Juicy Gossip and Juicy Pop in advertising and promotions in mid-2003 and mid-2004, in connection with two in-store promotions of Lancôme products. The 2003 Juicy Gossip promotion introduced JUICY ROUGE; the 2004 Juicy Pop promotion introduced Juicy Tubes Pop, and offered one-shot items Juicy Vernis, Juicy Crayon and Lôlli Pop. Couture has withdrawn its claims that the use of the marks JUICY ROUGE, Juicy Tubes Pop, Juicy Vernis, Juicy Crayon or Lôlli Pop, or that the sale of products bearing those marks, violated its rights.

Although Couture complains that scripts for radio advertising and mailings to consumers, both of which were undertaken through a co-op advertising program, and in-store promotional materials connected with the two promotions, infringed its trademark rights, the precise theory on which Couture is proceeding is hard to discern. It has disclaimed any interest in pursuing a false advertising claim, <u>see Avis Rent A Car System, Inc. v. Hertz Corp.</u>, 782 F.2d 381, 386 (2d Cir. 1982) (requiring evidence of actual confusion to support an implicit false advertising claim), and as noted, has explicitly withdrawn any claim that the sales of the products associated with either promotion infringed its rights. With respect to 2003, in particular, it also explicitly withdrew, in its summation, any contention that Lancôme acted in bad faith.

When asked to present authority for the proposition that a promotion is actionable in the absence of a false advertising claim or a claim that the sale of the goods associated with the promotion was a violation of the plaintiff's rights, Couture essentially side-stepped the question and re-characterized it as a request for law supporting the unremarkable proposition that point-of-sale materials may infringe a plaintiff's rights when the mark on the goods does not.[36] It then cited Section 45 of the Lanham Act, 15 U.S.C. § 1127, for the proposition that a mark is deemed to be used in commerce when it is placed on displays associated with goods sold in commerce, and Major League Baseball Properties, Inc. V. Sed Olet Denarius, Ltd., No. 90 Civ. 2170 (KMW), 1990 WL 151094 (S.D.N.Y. Oct. 5, 1990). Major League Baseball held that there was venue in this district over a Lanham Act action brought against a bar in Brooklyn named the Dodger Sports Bar, concluding that the defendant's advertising, which allegedly constituted "passing off", was a tort committed in this district even though the sale of goods associated with the advertising occurred in a neighboring district. Id. at *3. These references do not address, however, how advertising can be actionable when there is no claim that it is false advertising or that the sale of goods (or services) associated with the advertising is actionable.

---

[36] Essentially, what has happened here is that Couture's two promotion claims lost their mooring when Couture abandoned its claims that the products sold through these promotions violated its rights.

72

In any event, for many of the reasons already explained, Couture has not shown any infringement of its rights through these two Lancôme promotions. Couture has not shown that it has any rights in any mark apart from its Registered Marks. Therefore, to the extent that it complains that the use of phrase Juicy Pop in the campaign undertaken to introduce Lancôme's product Juicy Tubes Pop violated Couture's trademark rights in the mark Juicy Pop Princess, Couture has failed to show that it has any such rights.

Couture's claims regarding these promotions essentially hinge on the fact that Lancôme used the word juicy as an adjective in promotional materials, and as part of the name of the two promotions.[37] For instance, radio ads spoke of a "juicy make-over" and "juicy summer totes". The names of the campaigns were Juicy Gossip and Juicy Pop, even though Lancôme had no product with either name. The discussion of the Polaroid factors as applied to the claims concerning Juicy Wear is in large part relevant here as well.

In terms of the similarity of the marks, Couture has not shown that the use of the word juicy, when heard or viewed in the totality of a radio ad, brochure, or counter display, was likely to cause confusion. For many reasons, the use of the word juicy in the context of these two promotions would have seemed utterly unexceptional. First, Couture concedes that Lancôme was entitled

---

[37] As Lancôme emphasizes, Couture has not shown that press releases sent to beauty editors had any impact on consumers.

to sell five products with the name Juicy, including each of the products sold with these two promotions. Second, the word juicy is an apt adjective for cosmetics, connoting both moistness and shine. Third, every piece of promotional material made prominent use of the housemark Lancôme and the Juicy product name. The printed materials mailed to consumers used the Lancôme rose as well. The counter displays for these promotions, while vibrant and eye-catching, were exhibited in space clearly dedicated to Lancôme products and no other company's products. Every product displayed on the counters and in the displays had the Lancôme name on it and the brand name to which Couture makes no objection.

Couture also complains that Lancôme aimed these promotions at younger customers, by using bright colors like pink and orange, and referring to Hollywood divas as sources of makeup tips. Couture has not shown that Lancôme violated its rights by engaging in an effort to attract young consumers as new and loyal Lancôme customers. Lancôme was engaged in that marketing effort long before 2003 and long before it learned of the existence of Couture. Indeed, it introduced JUICY TUBES to the market in 2000 as part of the effort, initially with the Pollen seasonal collection, which emphasized the color orange, and in 2001 with Pinksplash, which as its name denotes, emphasized pink. It is not open to debate that orange and pink are traditional lipstick colors. Lancôme, like many consumer-oriented companies in America, also values its association with celebrities. Couture

has no monopoly on the youth market, the colors orange and pink, or Hollywood stars. While it certainly does have a right to make sure that Lancôme does not infringe Couture's rights in marketing Lancôme products to young women (or any woman), Couture has not shown that Lancôme acted with an intent to trade off Couture's reputation, or did so even unwittingly, in either promotion. An effort to create a youthful ambience in advertising or at sales counters is not a violation of Couture's rights, even when combined with the use of the word juicy.

It is unclear whether Couture continues to assert that the fact Lancôme gave away flip-flops and tote bags as part of the two-week Juicy Pop in-store promotion increased the likelihood of confusion. To the extent it does, that assertion can be swiftly rejected. It is uncontested that every gift associated with every in-store promotion comes in a bag. The flip-flops Lancôme included with this bag did not bear the word juicy, and there was nothing to suggest that they were a Couture product. No consumer familiar with Couture's flip-flops would have believed that these were Couture's footwear. Gift-with-Purchase programs have existed for years, and are used by Lancôme in many promotions that have nothing to do with its Juicy products. The fact that a summer promotion included flip-flops and a tote bag would not have led consumers to believe that Couture was a co-sponsor of either the promotional event or the products being sold with the

event.[38]

There is one residual issue concerning the promotions.  Some of the promotional materials for the Juicy Pop event remained on the counter for a few months after the promotion ended, and therefore during the time that Juicy Wear was introduced.  The Juicy Pop promotion included the display on countertops of a play-station, and of a Juicy Pop sign for the shelves below the counters.  The play-station was a plastic wheel, with holes to display Juicy products.  In the center of the wheel, and visible when products were not lying on it, was the logo Juicy Pop.  The name Lancôme was written on its front face.  Behind and above the play-station, and next to the below-counter Juicy Pop signs, was a large picture of a woman's face with the word Lancôme prominently inscribed across it.  Thus, the Lancôme house brand was prominently displayed with the play-station and the Juicy Pop signage.  The use of these promotional materials in connection with the sale of Juicy Wear does not alter the conclusion that Couture has failed to show that the sale of Juicy Wear infringed its rights.


## II. Common Law Claims

Claims for trademark infringement and unfair competition under New York common law, "share[] many common elements with the Lanham Act claims of false designation of origin and trademark

---

[38] Again, it is important to observe that Couture no longer contends that the sale of the Juicy products associated with the two promotions violated its rights.

infringement, including proof of actual confusion to recover damages, and proof of likelihood of confusion for equitable relief." <u>W.W.W. Pharm. Co. v. Gillette Co.</u>, 984 F.2d 567, 576 (2d Cir. 1993) (citation omitted). Under New York common law, an action for trademark infringement as well as an action for unfair competition "both require a showing that the public is likely to confuse the defendant's product or service with that of the plaintiff." <u>Allied Maint. Corp. v. Allied Mech. Trades, Inc.</u>, 42 N.Y.2d 538, 543 (N.Y. 1977). Under New York common law, the "essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." <u>Forschner Group, Inc. v. Arrow Trading Co., Inc.</u>, 124 F.3d 402, 408 (2d Cir. 1997) (citation omitted). Because Couture has failed to establish either likelihood of confusion or Lancôme's willfulness, its state law claims are rejected.

<u>III. Lancôme's Affirmative Defenses</u>

Lancôme asserts three affirmative defenses: laches, equitable estoppel and waiver. Given Couture's failure to prevail on its claims, it is unnecessary to reach any of these affirmative defenses. Nonetheless, Lancôme's affirmative defenses, particularly its laches defense, bring into focus important factual, legal and procedural issues in this case, and thus a discussion of those defenses is appropriate.

The first of these defenses is asserted as to the claims

Couture pressed at trial.  The latter two are asserted as to the claims Couture has recently abandoned.[39]

A.    Laches

Laches is a defense that bars a plaintiff's claim in equity "where he is guilty of unreasonable and inexcusable delay that resulted in prejudice to the defendant."  Ikelionwu v. U.S., 150 F.3d 233, 237 (2d Cir. 1998) (citation omitted).  "A party asserting a defense of laches must establish that: (1) the plaintiff knew of defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  Id.  The equitable defense of laches does not apply to an action at law.  County of Oneida, N.Y. v. Oneida Indian Nation of N.Y., 470 U.S. 226, 244 n.16 (1985); Ivani Contracting Co. v. City of New York, 103 F.3d 257, 260 (2d Cir. 1997).  This defense is considered solely, therefore, with respect to Couture's request for a permanent injunction.

For equitable claims brought under the Lanham Act, where no limitations period is provided by the statute, courts look to the state statute of limitations to determine which party "possesses the burden of proving or rebutting the defense."  Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996).  When a

---

[39] At summation, Lancôme requested that the defenses of equitable estoppel and waiver be considered as to the abandoned claims unless those claims were found to be barred by the doctrine of res judicata.  The parties have not briefed the issue of res judicata, and in any event it is premature to address the res judicata effect of any judgment entered in this action.

suit is brought prior to the running of that statute of
limitations there is no presumption of laches, and the burden
remains on the defendant to prove the defense.  Id.  Once the
statute of limitations has run, however, the burden shifts to the
plaintiff to show why laches should not be applied.  Id.  Courts
have consistently held that the six year fraud statute,
N.Y.C.P.L.R. 213(8), is the applicable state statute of
limitations for Lanham Act claims brought in New York.  Id.

Lancôme launched Juicy Wear in 2004 and the promotions to
which Couture objects took place in 2003 and 2004.  Couture's
complaint was filed on September 9, 2004.  Because Couture's
claims are brought within the statute of limitations, the burden
is on Lancôme to prove the three elements of laches.  Lancôme has
proved each element.

Because Juicy Wear is the sixth Juicy product Lancôme has
introduced into the marketplace, and because Couture owns rights
to the word JUICY but not to the word Wear, it is appropriate to
consider the issue of laches against the backdrop of Lancôme's
line of Juicy products.  Couture argues that because the only
claims it continues to press involve actions taken by Lancôme in
2003 and 2004 it has not delayed in asserting its rights.
Couture has failed to explain, however, why the harm done to
Couture's JUICY mark by Lancôme's use of Juicy Wear was different
from any harm done by the use of Juicy for its other products.
In fact at trial, Couture admitted that Juicy Wear was no more
damaging to Couture's mark than JUICY ROUGE.  Having failed to

establish why the recent uses of Juicy are different, the only reasonable conclusion is that Couture's delay is properly measured from the time when it first became aware of JUICY TUBES, which was at least 2001, the second year Lancôme sold JUICY TUBES.

In analyzing the reasons behind Couture's failure to act until September 2004, "it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry." Stone v. Williams, 873 F.2d 620, 624 (2d Cir. 1989). Couture has failed to present a tenable explanation for why it made no objection, either formal or informal, as Lancôme systematically developed its line of Juicy products. Taylor and Jacobson essentially conceded that Couture decided quite consciously not to object to Lancôme's use of the word Juicy for product names. While there was some reference to Couture's desire to use its financial resources to grow instead of paying litigation costs, Couture presented no evidence that it was unable to afford counsel. Indeed, it had outside trademark counsel who were acting on its behalf since 1994, and working actively since 1998. In any event, a lack of finances alone cannot excuse a failure to object. Frank F. Smith Hardware Co. v. S.H. Pomeroy Co., 299 F. 544, 547 (2d Cir. 1924); see also Leggett v. Standard Oil Co., 149 U.S. 287, 294 (1893). By April 2003, of course, Couture had been purchased by a giant in the clothing industry and it still failed to act in the United States, for instance, choosing not to oppose the registration of

JUICY ROUGE in late 2003.

Lancôme has clearly established that it has been prejudiced by Couture's delay.  See Scarves By Vera, 544 F.2d at 1173 (noting that it is appropriate to consider equities in junior user's favor in considering injunction against non-competitive product).  It has made a substantial commitment of corporate talent and money to the development of its Juicy line of products, including Juicy Wear.  It has spent substantial sums advertising JUICY TUBES, JUICY ROUGE, Juicy Tubes Pop and Juicy Wear.  These efforts would be severely compromised by a decision granting Couture the relief it seeks.

Couture cannot, and does not contest that it sat on its rights in the United States.  Instead, it argues that its failure to act before late 2004 is mitigated by the actions it took in Europe in 2003 and in early 2004.

Couture's actions in Europe are of minimal relevance to the question of laches.  Trademark rights are territorial, Buti v. Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir. 1998), and therefore even decisions rendered by foreign courts are generally irrelevant and inadmissible in trademark actions in the United States.  McGraw-Hill Cos., Inc. v. Ingenium Tech. Corp., 375 F. Supp. 2d 252, 255 (S.D.N.Y. 2005); see also Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir. 1956).[40]

_____

[40] Here there has been no final decision by any foreign court, only a "draft" opinion by an official in the French Trademrk Office regarding Lancôme's application to register the mark Juicy for cosmetics.  That initial decision by the French Trademark Office turned on a prior registration, not based on

Couture emphasizes that in February 2003 it opposed Lancôme's application to register Juicy in France for cosmetics. This was Lancôme's first application to register the word Juicy by itself. Lancôme immediately protested that it had priority given its registrations for JUICY TUBES and JUICY ROUGE in France. Couture then wrote a letter in June 2003 which essentially acknowledged that it had not opposed Lancôme's United States trademark applications and that the word juicy has utility in describing the quality of cosmetics. This is hardly notice to Lancôme that Couture would seek to limit Lancôme's rights to use Juicy in the United States market. Lancôme ignored Couture's overtures to engage in negotiations that would allow Couture to enter the cosmetics market. Then, late in 2003, Couture let Lancôme obtain registration for JUICY ROUGE in the United States without any opposition. There is nothing from these events in 2003 that permits Couture to roll back the clock and claim that it adequately asserted its rights that year.

Finally, Couture's pursuit of a global settlement with Lancôme in July 2004 was not an assertion of rights in the United States. The discussions were preceded by a letter asserting rights solely in Europe, where the parties had already been in active dispute. More importantly, in the letter Couture did not even represent that it had superior rights to the word "juicy" in

_____

use, that Couture had received for JUICY COUTURE for cosmetics. As this example illustrates, the standards governing trademark issues can differ substantially from one jurisdiction to another.

cosmetics.

Lancôme has proved each of the three elements necessary to establish its affirmative defense of laches. If this Court were to find a likelihood of confusion, Lancôme's affirmative defense would still bar Couture's claim for injunctive relief.[41]

B.   Equitable Estoppel and Waiver

The doctrine of equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004) (citation omitted). The three elements Lancôme must establish to invoke equitable estoppel are: "1) a misrepresentation by the plaintiff, 2) reasonable reliance by the defendant, and 3) prejudice." Id.

Waiver under federal law will be recognized where "parties were aware of their rights and made the conscious choice, for whatever reason, to waive them." Mooney v. City of New York, 219 F.3d 123, 131 (2d Cir. 2000) (citation omitted). The conduct constituting waiver must be "clear and unequivocal" and a party asserting an implied waiver bears the burden of proving that the requirements for waiver have been met. Id. Waiver under New

---

[41] Even with a finding of infringement not barred by laches, the requested injunction would be far too broad, as well as being too vague.

York law does not differ "in practical effect" from waiver under federal law. Id. "Under New York law, a claim of waiver requires proof of an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004) (citation omitted).

Lancôme has shown that it is entitled under the doctrine of waiver to a judgment in its favor with regard to all claims brought by Couture based on Lancôme's use of the product names JUICY TUBES, JUICY ROUGE, Juicy Tubes Pop, Juicy Vernis, and Juicy Crayon. Couture asserted claims based on these marks, both fact and expert discovery proceeded on these marks, and Couture explicitly withdrew its claims regarding them on the eve of trial. In reliance on that abandonment, Lancôme did not try these claims. Lancôme has not shown any misrepresentation by Couture and therefore is not entitled to a judgment based on equitable estoppel.

## Conclusion

Couture has failed to carry its burden on any of its claims. Lancôme shall submit a proposed judgment by May 5, 2006; Couture shall respond by May 12.


SO ORDERED:
Dated:     New York, New York
           April 19, 2006

                                    _____
                                            DENISE COTE
                                    United States District Judge